[Crim. No. 7875. Fourth Dist., Div. Two. May 23, 1977.]

THE PEOPLE, Plaintiff and Respondent, v.
BOYD GERALD CONDLEY et al., Defendants and Appellants.

**COUNSEL**

Lawrence M. Gassner and Geoffrey Rotwein, under appointments by the Court of Appeal, for Defendants and Appellants.

Evelle J. Younger, Attorney General, Jack R. Winkler, Chief Assistant Attorney General, Daniel J. Kremer, Assistant Attorney General, Alan S. Meth and Jay M. Bloom, Deputy Attorneys General, for Plaintiff and Respondent.

**OPINION**

**MORRIS, J.**—The defendants were convicted by a jury of escape from lawful custody. (Pen. Code, § 4532, subd. (b).) They appeal. Judgment affirmed.

### *Statement of the Case*

Defendants, Boyd Gerald Condley and Allan Darrell Cummins, were indicted on charges of attempted escape from state prison (Pen. Code, § 4530, subd. (b)) and escape from lawful custody of the San Bernardino County Sheriff (Pen. Code, § 4532, subd. (b)).

Cummins was represented by counsel, and Condley represented himself. The defendants' motion to sever the attempted escape from the escape charge was granted.

On March 30, 1976, judgments were entered against both defendants on the charge of escape from lawful custody, and the attempted escape from state prison count was dismissed.

Both defendants were shackled during the entire trial. At the beginning of the trial on February 19, 1976, the trial court denied defendants' motions to be relieved of the shackles. On March 2, 1976, following the Supreme Court ruling in *People* v. *Duran,* 16 Cal.3d 282 [127 Cal.Rptr. 618, 545 P.2d 1322], defendants moved for mistrial on the grounds of prejudice resulting from their having appeared before the jury in shackles. The motion was denied.

### Statement of Facts

On November 7, 1975, defendants were in the lawful custody of the San Bernardino County Sheriff's office, and were being transported from county jail to the West End Substation to await court appearances in Ontario.

At approximately 6:45 a.m. while the deputies were temporarily absent, defendants slipped out of their handcuffs and fled the bus through a rear window. Condley was recaptured almost immediately. Cummins was apprehended around 11 a.m. when sheriff's deputies responded to a report that Cummins had been seen.

Both defendants admitted escaping from the bus but relied on the limited defense of necessity as set forth in *People* v. *Lovercamp,* 43 Cal.App.3d 823 [118 Cal.Rptr. 110, 69 A.L.R.3d 668], asserting that they had been threatened by officers at the county jail on November 6, 1975. The defendants had made no previous report of the alleged threats.

The defendants' version of the circumstances surrounding their admission to county jail on November 6, 1975, was that they were searched; that several of Cummins' pencils were broken; that a photo of Cummins' girlfriend was destroyed and his letters scattered on the floor; that a deputy stated, "We don't coddle state prisoners here, we beat them"; that as many as eight officers grouped around defendants; that other threats were made which Cummins could not recall; that Condley heard someone say "Sooner or later we are going to get a chance at you and your friends"; that following their admission a sandwich was thrown to Cummins and he was told "to sit [his] ass down or [the officer] would beat [him] down."

The officers' testimony describes the incident as a routine search of prisoners and property prior to admitting them to county jail; that pencils are broken because the metal eraser ends are used by prisoners to pick locks; that the photo was contraband (i.e., a nude photo); that no threats were made; and that defendants were never surrounded by a large number of officers.

### Discussion

### 1. *Physical Restraints*

In denying defendants' motion to be relieved of physical restraints, the trial judge stated: "I think in view of the facts in this case, there have been many escapes in the history of these defendants, that I have a certain duty to my court, my staff and I am going to stand by that duty." The record reveals that the trial judge made his decision to impose restraints under the following circumstances:

(1) Defendants were on trial for escape from lawful custody.

(2) Defendants at the time of the November 7, 1975, escape were in lawful custody for attempted escape from a state prison. Both defendants were indicted on this charge (Pen. Code, § 4530, subd. (b)).

(3) The amended indictment alleged Condley had prior felony convictions for escape by means of force or violence (Pen. Code, § 4530, subd. (a)); driving a motor vehicle without consent of the owner (Veh. Code, § 10851); second degree burglary (Pen. Code, § 459); and robbery (Pen. Code, § 211).

(4) The amended indictment alleged that Cummins had prior felony convictions in 1975, for second degree burglary (Pen. Code, § 459) and, in 1972, for first degree robbery (Pen. Code, § 211).

(5) Both the escape and the escape attempt were joint efforts of these defendants, and the defendants were being tried jointly.

In *People* v. *Duran, supra,* 16 Cal.3d 282, the Supreme Court held that a defendant cannot be subjected to physical restraints in the courtroom while in the jury's presence unless there is a showing of "manifest need of such restraints." It was further stated that "The showing of nonconforming behavior in support of the court's determination to impose

physical restraints must appear as a matter of record and, except where the defendant engages in threatening or violent conduct in the presence of the jurors, must otherwise be made out of the jury's presence. The imposition of physical restraints in the absence of a record showing of violence or a threat of violence or other nonconforming conduct will be deemed to constitute an abuse of discretion." (*Id.,* at p. 290.)

A mere showing that each defendant had prior felony convictions involving the use of force or violence would be insufficient to establish the "manifest need" required to justify the use of restraints. (*People* v. *Duran, supra,* 16 Cal.3d 282, 293.) However, when these violent propensities are viewed in the context of two very recent joint escape attempts for which both defendants were indicted, as well as Condley's 1964 conviction under Penal Code section 4530, subdivision (a) (escape by means of force or violence), we have reached the threshold of "manifest need" required by *Duran.*

The Supreme Court pointed out in *Duran* that a showing that the accused is a violent person is not the sole justification for imposing restraints stating: "An accused may be restrained, for instance, on a showing that he plans an escape from the courtroom or that he plans to disrupt proceedings by nonviolent means. Evidence of any nonconforming conduct or planned nonconforming conduct which disrupts or would disrupt the judicial process if unrestrained may warrant the imposition of reasonable restraints if, in the sound discretion of the court, such restraints are necessary." (*People* v. *Duran, supra,* 16 Cal.3d 282, 292-293, fn. 11.)

The court in *Duran* cited as examples of "manifest need," cases wherein the defendants expressed an intention to escape (*People* v. *Kimball,* 5 Cal.2d 608, 611 [55 P.2d 483]); where there is evidence of an escape attempt (*People* v. *Burnett,* 251 Cal.App.2d 651, 655 [59 Cal.Rptr. 652]); or where a defendant attempts to escape from county jail while awaiting trial on other escape charges (*People* v. *Stabler,* 202 Cal.App.2d 862, 863-864 [21 Cal.Rptr. 120]; and see *People* v. *Duran, supra,* 16 Cal.3d 282, 291.)

The test on appeal is whether the trial court abused its discretion (*People* v. *Duran, supra,* 16 Cal.3d 282, 293). In *Duran,* the Supreme Court concluded that shackling based on the fact that defendant was charged with violent crimes, in the absence of a record showing other reasons for shackling the defendant, was an abuse of discretion. The

Supreme Court cautioned that trial courts should not adopt a general policy of imposing restraints upon prison inmates charged with new offenses and that the determination to impose restraints should be made on a case-by-case basis.

In the instant matter the trial judge's imposition of restraints on defendants did not emanate from a general policy, but was based upon the circumstances of this case. Furthermore, the trial court in imposing restraints did so in such a manner as to be as unobtrusive as possible, thereby minimizing any prejudice. The defendants' legs were shackled in such a manner that the restraints were out of the view of the jury, and when the defendants took the stand or otherwise moved from place to place, the court recessed so that the shackles could not be observed by the jury.

Under the circumstances, the trial court did not abuse its discretion in requiring defendants to be shackled throughout their escape trial.

Defendants argue that while the substantive rule in *Duran* was merely a restatement of existing law (see *People* v. *Harrington,* 42 Cal. 165, 168 and also *People* v. *Kimball, supra,* 5 Cal.2d 608), the rule requiring a record was new. Therefore, defendants contend that after *Duran* was decided on February 26, 1976, the court should have declared a mistrial since the hearing was not in compliance with the *Duran* rule. The trial began on February 19, 1976, and continued until March 2, 1976. The original defense motion to relieve the defendants of the restraints and the court's ruling thereon was made on February 19, 1976. On March 2, 1976, after both the prosecution and the defense had rested, the defendants first made a motion to dismiss in light of the *Duran* decision.

■ "Where a rule of decisional law is enunciated as an application of a previously existing principle, it must be applied in all open cases. (*People* v. *Heredia* (1971) 20 Cal.App.3d 194, 199 [97 Cal.Rptr. 488].) Where a new rule of law is stated, however, the retroactivity of a decision must be established by the court faced with the application of that ruling. That part of *Duran* which holds that restraints may not be imposed in the absence of a manifest need for such restraints is an application of the rule established in *People* v. *Harrington* (1871) 42 Cal. 165. However, that portion of *Duran* which holds that there must be a record showing of the need for restraints enunciates a new rule of law." (*People* v. *Sanford,* 63 Cal.App.3d 952, 956-957 [134 Cal.Rptr. 155].) ■ We conclude, therefore, that the requirement for a record is applicable only in cases

wherein the trial court's ruling on the question of restraints was subsequent to February 27, 1976. In the instant case, the court's ruling was on February 19, 1976. (See *In re Yurko,* 10 Cal.3d 857, 866 [112 Cal.Rptr. 513, 519 P.2d 561]; *People* v. *Edwards,* 71 Cal.2d 1096, 1107 [80 Cal.Rptr. 633, 458 P.2d 713]; *People* v. *Feggans,* 67 Cal.2d 444, 448 [62 Cal.Rptr. 419, 432 P.2d 21].)

In any event, the record is sufficient to allow review of the trial court's exercise of discretion. (See *People* v. *Duran, supra,* 16 Cal.3d at p. 293.)

## 2. *Lovercamp Defense*

In *People* v. *Lovercamp, supra,* 43 Cal.App.3d 823, this court held that in extremely limited circumstances a defense of necessity is available to prisoners charged with escape. In articulating the elements of the limited defense of necessity, we stated that the following conditions must exist: "(1) The prisoner is faced with a specific threat of death, forcible sexual attack or substantial bodily injury in the immediate future; [¶] (2) There is no time for a complaint to the authorities or there exists a history of futile complaints which make any result from such complaints illusory; [¶] (3) There is no time or opportunity to resort to the courts; [¶] (4) There is no evidence of force or violence used toward prison personnel or other 'innocent' persons in the escape; and [¶] (5) The prisoner immediately reports to the proper authorities when he has attained a position of safety from the immediate threat. [Fn. omitted.]" (*Id.,* at pp. 831-832.)

■ The *Lovercamp* defense was the defendants' sole defense during the trial. The trial court instructed the jury that "The defendant has the burden of proving by the preponderance of the evidence that necessity forced him to escape. Preponderance of the evidence means such evidence as, when weighed with that opposed to it, has more convincing force and the greater probability of truth."

Defendants contend that the above instruction constitutes reversible error. They cite *People* v. *Tewksbury,* 15 Cal.3d 953 [127 Cal.Rptr. 135, 544 P.2d 1335], in support of their contention that they need only raise a reasonable doubt. In *People* v. *Tewksbury,* the Supreme Court stated: "The general rule is that '[e]xcept as otherwise provided by law, the burden of proof requires proof by a preponderance of the evidence' (Evid. Code, § 115). [¶] An important exception exists, however, in criminal cases as to the proof of all elements of the crime or crimes

charged. Thus when there is placed upon an accused the burden of interjecting a factual contention which, if established would tend to overcome or negate proof of any element of the crime . . . the accused need only raise a reasonable doubt . . . ." The court goes on to point out that: "There are, however, other instances of defenses asserted by an accused which raise factual issues collateral to the question of the accused's guilt or innocence and do not bear directly on any link in the chain of proof of any element of the crime. Among such defenses are those which raise no challenge to the sufficiency of the prosecution's proof of any element of the crime charged *but for reasons of public policy* insulate the accused notwithstanding the question of his guilt." (*People* v. *Tewksbury, supra,* 15 Cal.3d 953, 963-964; italics added.)

Therefore, the crucial issue in this appeal is whether the *Lovercamp* defense goes to the elements of the crime of escape (Pen. Code, § 4532, subd. (b)) or whether the defense involves proof of collateral facts which do not bear directly on the chain of proof of the elements of the crime but, because of public policy, proof of the defense insulates the defendants from punishment notwithstanding their guilt.

In *People* v. *Tewksbury, supra,* 15 Cal.3d 953, the defendant, convicted of first degree murder (Pen. Code, § 187) and two counts of robbery in the first degree (Pen. Code, § 211), contended that his convictions were unlawful in that they were supported only by the uncorroborated testimony of two witnesses who were accomplices as a matter of law, and alternatively that the jury was improperly instructed that he had the burden of proving by a preponderance of the evidence that one of such witnesses was an accomplice. The Supreme Court noted that initially defendant was confronted with the express provision of the Evidence Code which states, in pertinent part, that a "party claiming that a person is guilty of crime or wrongdoing has the burden of proof on that issue." (Evid. Code, § 520, *People* v. *Tewksbury, supra,* 15 Cal.3d at pp. 962-963; and see Evid. Code, § 500.) The court noting that the defendant had the burden of producing evidence to raise the accomplice issue (Evid. Code, § 550) and that in the absence of such proof the witness is treated as not being an accomplice, concluded that defendant must prove the collateral fact that the witness was an accomplice by a preponderance of the evidence.

The conclusion was supported by analogy to other instances where the defense challenges the "reliability" of particular incriminating evidence (*People* v. *Tewksbury, supra,* 15 Cal.3d 953, 964-965) and to the defense

of entrapment when the question of whether an accused was entrapped must be proved by a preponderance of the evidence.

The California courts have established the defense of entrapment not because it directly relates to an element of the crime (i.e., intent) but rather ". . . out of regard for its own dignity, and in the exercise of its power and the performance of its duty to formulate and apply proper standards for judicial enforcement of the criminal law, the court refuses to enable officers of the law to consummate illegal or unjust schemes designed to foster rather than prevent and detect crime." (*People* v. *Benford,* 53 Cal.2d 1, 9 [345 P.2d 928]; and see *People* v. *Moran,* 1 Cal.3d 755, 760-761 [83 Cal.Rptr. 411, 463 P.2d 763]; *People* v. *Valverde,* 246 Cal.App.2d 318 [54 Cal.Rptr. 528].)

In *Lovercamp* we clearly explicated a public policy defense stating: "In a humane society some attention must be given to the individual dilemma. In doing so *the court must use extreme caution* lest the overriding interest of the public be overlooked. The question that must be resolved involves looking to all the choices available to the defendant and then determining whether the act of escape was the *only viable and reasonable choice available.* By doing so, both the public's interest and the individual's interest may adequately be protected. In our ultimate conclusion it will be seen that we have adopted a position which gives reasonable consideration to both interests. While we conclude that under certain circumstances a defense of necessity may be proven by the defendant, at the same time we place rigid limitations on the viability of the defense in order to insure that the rights and interests of society will not be impinged upon." (*People* v. *Lovercamp, supra,* 43 Cal.App.3d 823, 827; italics added.)

Under the limited circumstances described in *Lovercamp,* when the defendant's decision to escape is *objectively* the "only viable and reasonable choice available" we excuse the offense as being justified under the circumstances. It would be ludicrous to apply a subjective standard to determine whether the defendant's escape is justified as being the only viable and reasonable choice. These terms themselves connote an objective standard. As noted in *Lovercamp,* "It is hardly earth shattering to observe that prisons are not Brownie Camps and that within the inmate population are those who, if given the opportunity, will depart without due process of law." (*Id.,* at p. 826.) Were we to adopt a subjective standard to establish the elements of the *Lovercamp* defense, it would take little imagination on the part of any inmate to claim that the

prison milieu itself creates, subjectively, the requisite elements of the *Lovercamp* defense.

Defendants would have us equate the limited defense of necessity with duress. In *People* v. *Graham,* 57 Cal.App.3d 238 [129 Cal.Rptr. 31], the defendant asserted the defense of duress. The trial court instructed the jury that defendant had "the burden of proving by a preponderance of the evidence that the crime was committed under duress." (*Id.,* at p. 240.) Through analogy with the defenses of unlawful arrest (*People* v. *Agnew,* 16 Cal.2d 655, 665-667 [107 P.2d 601]), alibi (*People* v. *Costello,* 21 Cal.2d 760, 765-766 [135 P.2d 164]), unconsciousness (*People* v. *Hardy,* 33 Cal.2d 52, 63-66 [198 P.2d 865]), and intent to marry in a case of taking a female for purposes of prostitution (*People* v. *Marshall,* 59 Cal. 386, 388-389), the Court of Appeal held that, as in the above defenses, the proof of the defense negates an element of the crime charged and therefore the defendant need only raise a reasonable doubt as to the existence or nonexistence of this fact. (*People* v. *Graham, supra,* at p. 240.)

The *Lovercamp* limited defense of necessity is clearly distinguishable from duress. Penal Code section 26, at the time of trial, stated in pertinent part that: "All persons are capable of committing crimes except those belonging to the following classes: . . . Eight—Persons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they *had reasonable cause to and did believe their lives* would be endangered if they refused." (Italics added.) (This subsection has not been changed but is found in Pen. Code, § 26, subd. Seven.)

In applying the foregoing section the courts have noted that " 'The common characteristic of all the decisions upholding the excuse [of duress] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm.' " (*People* v. *Lo Cicero,* 71 Cal.2d 1186, 1191 [80 Cal.Rptr. 913, 459 P.2d 241], citing *People* v. *Otis,* 174 Cal.App.2d 119, 125 [344 P.2d 342].) " 'In order for duress or fear produced by threats or menace to be a valid, legal excuse for doing anything, which otherwise would be criminal, the act must have been done under such threats or menaces as show that the life of the person threatened or menaced was in danger, or that there was reasonable cause to believe and actual belief that there was such danger.' " (*People* v. *Sanders,* 82 Cal.App. 778, 785 [256 P.2d 251]; and

see CALJIC No. 4.40.) To establish duress a defendant would have to show that he had (1) an actual belief his life was threatened and (2) a reasonable cause for such belief. Because of the immediacy requirement, a person committing a crime under duress has only the choice of imminent death or executing the requested crime. The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent. The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea and is liable for the crime. (See Pen. Code, § 31.)

As we have seen the limited defense of necessity as explicated in *Lovercamp* requires five conditions. The defense is only available when all five conditions are met. (*People v. Wheeler,* 68 Cal.App.3d 1056, 1058 [137 Cal.Rptr. 791].) When a defendant has established these five conditions, what he has done is to establish the existence of necessity. None of these conditions are in derogation of the element of general intent required to convict defendants of escape from lawful custody. (See *People v. Hayes,* 16 Cal.App.3d 662, 666-667 [94 Cal.Rptr. 222]; *People v. Richards,* 269 Cal.App.2d 768 [75 Cal.Rptr. 597].) While absolute necessity caused by forces of nature (e.g., storms, fire, earthquake, etc.) may both justify the escape and prevent defendant's formulation of the general intent required to be convicted of escape, necessity under *Lovercamp* generally does not have such an effect. The necessity in *Lovercamp* is not like the classical paradigm of absolute necessity where the prisoner escapes to save his life from the immediate danger of a prison fire. (See *People v. Lovercamp, supra,* 43 Cal.App.3d 823, 826, citing 1 Hale P.C. 611 (1736), and Gardner, *The Defense of Necessity and the Right to Escape from Prison—A Step Towards Incarceration Free from Sexual Assault,* 49 So.Cal.L.Rev. 110, hereafter cited as *Gardner.*) Absolute and imminent necessity are rare, and even rarer is prosecution under such circumstances. (See Gardner, *supra,* at p. 115, fn. 19.)

Unlike duress, under *Lovercamp* the threat is in the "immediate future." (Compare *People v. Otis, supra,* 174 Cal.App.2d 119, 125.) Furthermore, specific threats of substantial bodily injury, forcible sexual attack, as well as a threat against one's life may be utilized as a basis for the defense. Duress requires an imminent threat to one's life. (Pen. Code, § 26, subd. Seven; *People v. Otis, supra*; *People v. Richards, supra,* 269 Cal.App.2d 768; and see CALJIC No. 4.40.) Under *Lovercamp* a defendant does formulate the general intent to escape although under some pressure. (See Gardner, *supra,* at p. 120.) The conditions of

*Lovercamp* that require the escapee to complain to the authorities or courts, when possible; to escape without the use of force or violence, and to immediately turn himself in once attaining a position of safety from the immediate threat, are merely prerequisites to the establishment of necessity. This necessity being an objective public policy decision that, of the alternatives which faced the escapee at the time of the escape, the escapee's selection of the escape alternative was the lesser of the evils.

We conclude that by definition, the *Lovercamp* defense is founded upon public policy and provides a justification distinct from the elements required to prove escape. Therefore, the trial court correctly instructed the jury that the defendants had the burden of proving the defense by a preponderance of the evidence.

### 3. *Cummins' Extrajudicial Statement*

On November 7, 1975, after being advised of his *Miranda* rights, Cummins made an understanding waiver of his rights and consented to interrogation at the sheriff's office. In the course of the conversation Cummins admitted that he had been placed on the sheriff's bus on the morning of November 7, 1975; that he knew he was in the custody of the sheriff; that he intended to escape; that after a stop in Fontana, he slipped out of the cuffs by the use of his thumbnail; that upon arriving at Ontario he pushed out the back window of the bus and ran; that he fled toward the freeway and jumped a fence; that no police officers, in county jail or elsewhere, had threatened him; that he was not in immediate fear for his life, but feared future harm if he should be sent to some place like Soledad or San Quentin; that his fear was not a result of a specific threat to his life but was based on a rumor that he had a "rat jacket"; that nobody on the sheriff's bus had threatened him; that he had not expressed his fear to any officers either before or after boarding the bus; that at no time did he attempt to notify officers of his fear; that he was aware he had escaped; and that he had not attempted to turn himself in after he escaped.

On November 21, 1975, in the course of investigating a fight between other prisoners, an officer at county jail asked Cummins "how our facility compared with state prison." The officer testified that the one question asked was for the purpose of security; that he made no recording or record of the conversation at the time; and that he later wrote an intraoffice memo relating to these security problems. The memo was not sent to the prosecutor. However, the prosecution became

aware of the conversation after defendant's counsel said he was going to call the officer as a witness.

In response to the officer's question, Cummins entered into a lengthy monologue describing the defects in the county jail facility, the sheriff's bus, the unloading procedures at the West End Substation and possible escape routes. He also volunteered that he continually takes off handcuffs and leg irons while on the bus, picking them with the use of a metal eraser end of a pencil, a comb, toothpick, or any small object of that kind, and that while he "would not use any form of violence toward an officer to escape . . . if somebody else [did] he would then take that opportunity to escape." And he went on to say that he is constantly "looking for a way out."

■ The defense contends that the trial court erred in admitting this statement, since no new *Miranda* warning was given. For the reasons hereinafter set forth it is unnecessary for us to consider whether this statement was the result of improper interrogation or simply volunteered as respondent contends. The defendant's November 7 confession admitted all of the elements of the offense (Pen. Code, § 4532, subd. (b)) and negated the existence of the elements of a *Lovercamp* defense; the November 21 statement added nothing to the original confession; it made no reference to the escape of November 7; it only referred conjecturally to what the defendant would do if an opportunity to escape arose and did not in any way refer to anything which would have bearing on the only defense offered at trial.

In describing his escape, the defendant testified at trial that after relieving himself of the handcuffs and chains he became confused; that he did not tell the officers the truth at the November 7 interrogation; that he had been threatened in county jail prior to his escape; and that he lied because he did not trust the interrogating officer.

However, he also testified that he was not in fact "under any direct fear [for his life while] on the bus"; that there was no "immediate or direct threat" while on the bus; that he did not think the officers who escorted him to the sheriff's bus on the morning of November 7 were the same as the ones that allegedly threatened him the day before; that the threats which were made did not place him under an immediate specific threat of death; that he told no one that he was under an immediate specific threat of great bodily harm; that while in court on November 7 and several occasions shortly thereafter, he never mentioned to the court

that he was under any immediate specific threat of great bodily harm; that he did not know where he was being transported on the bus, but since the other prisoners were being transported to court, he assumed he was going to court; and that he had become aware of the *Lovercamp* defense through his attorney.

In light of Cummins' prior confession and the extremely weak, if not nonexistent, *Lovercamp* defense, we conclude that the November 21, 1975, statement was harmless beyond a reasonable doubt. (*Chapman* v. *California,* 386 U.S. 18 [17 L.Ed.2d 705, 87 S.Ct. 824, 24 A.L.R.3d 1065].)

Condley asserts that Cummins' statement of November 7 was involuntary; that Cummins' November 21 statement was obtained in violation of *Miranda* and that the trial court should have granted Condley a mistrial due to the admission of his codefendant's statements at the trial.

■ Although Cummins did not raise the issue of the voluntariness of the first statement on appeal, Condley nonetheless has standing to do so. (*People* v. *Varnum,* 66 Cal.2d 808, 812-813 [59 Cal.Rptr. 108, 427 P.2d 772].)

The trial court weighed the conflicting evidence, heard the tape recording of the statement, observed the demeanor of the witnesses, and concluded that the statement was voluntary. ■ "A well settled principle of appellate review dictates that all intendments be indulged to support the trial court findings and that the reviewing court consider the evidence in a light most favorable to the respondent." (*People* v. *Culver,* 10 Cal.3d 542, 547 [111 Cal.Rptr. 183, 516 P.2d 887].) Our independent review of the record confirms the trial court's determination that the first Cummins' statement was voluntary.

■ As to Cummins' second statement, Condley has no standing to challenge the violation of Cummins' *Miranda* rights. (*People* v. *Varnum, supra,* 66 Cal.2d at pp. 812-813.) Furthermore, Condley was never mentioned and the jury was instructed that evidence admitted against one defendant, but not admitted against the other, must not be considered against the other defendant.

■ Finally, Condley asserts that despite the fact he voluntarily chose to represent himself, and failed to object to Cummins' extrajudicial statements on *Aranda* grounds, that the court should have, on its own motion, granted a mistrial. (*People* v. *Aranda,* 63 Cal.2d 518 [47 Cal.Rptr.

353, 407 P.2d 265].) This argument is a back door attempt to assert ineffectiveness of counsel. In establishing the right of a defendant to act as his own counsel, the United States Supreme Court stated: "[W]hatever else may or may not be open to him on appeal, a defendant who elects to represent himself cannot thereafter complain that the quality of his own defense amounted to a denial of 'effective assistance of counsel.'" (*Faretta* v. *California,* 422 U.S. 806, 835, fn. 46 [45 L.Ed.2d 562, 581, fn. 46, 95 S.Ct. 2525, 2541, fn. 46]; and see *People* v. *Harris,* 65 Cal.App.3d 978 [135 Cal.Rptr. 668].) Condley had an opportunity but failed to object to either of Cummins' statements and failed to request the deletion of portions which may have implicated him. He cannot now complain of the resulting prejudice. (*People* v. *Epps,* 34 Cal.App.3d 146, 159 [109 Cal.Rptr. 733].) In any event, Cummins' statements do not incriminate Condley.

### 4. *Use of Priors for Impeachment*

Both defendants testified at the trial. The trial court permitted the prosecutor to impeach Condley with his 1964 robbery and 1975 burglary convictions, excluding introduction of convictions in 1963 for auto theft and in 1964 for escape. The trial court permitted a 1972 robbery conviction and a 1975 burglary conviction to be used to impeach Cummins.

A *Beagle* objection was made to the use of these priors for the purposes of impeachment. (*People* v. *Beagle,* 6 Cal.3d 441 [99 Cal.Rptr. 313, 492 P.2d 1]; and see Evid. Code, §§ 352, 788.)

■ Defendants argue that "Robbery is clearly an assaultive crime not involving honesty or integrity. . . ." (See *People* v. *Beagle, supra,* at p. 453.) This contention is without merit. By definition robbery is "the felonious taking of personal property in the possession of another, . . ." (Pen. Code, § 211.) Defendants also contend that these robbery convictions were too remote. The circumstances of this case, including the fact that neither defendant had lead a legally blameless life since the robbery convictions, compel the conclusion that the trial court did not abuse its discretion in allowing the use of the prior robbery convictions for impeachment. (*People* v. *Beagle, supra,* at p. 453.)

■ As to the recent *burglary* convictions, the defendants assert that the fact that they were codefendants in burglary was prejudicial, in light of their being codefendants on the present escape charge. Neither

defendants' citations to the record, nor our independent review, indicate that this fact was presented to the jury. There was no abuse of discretion in allowing the prior burglary convictions to be used for the purpose of impeachment. (*People* v. *Beagle, supra,* 6 Cal.3d at pp. 452-453; and see *People* v. *Stewart,* 34 Cal.App.3d 244, 247-248 [109 Cal.Rptr. 826].)

### 5. *Discovery Motion*

After the People had rested, defendants attempted to subpoena the personnel and unit files on the two sheriff's officers involved in the alleged threats to defendants while being admitted to county jail. The prosecutor made a motion to quash the subpoena duces tecum on the grounds that the discovery motion was untimely; that the material was not relevant to the issues in the case; and that defendants had not made the requisite initial showing to be entitled to discover the materials sought. The trial court granted the motion to quash. Defendants claim this was prejudicial error.

Generally, in criminal discovery matters, the trial court has discretion in deciding whether or not the material sought may be discovered. (*Hill* v. *Superior Court,* 10 Cal.3d 812, 817 [112 Cal.Rptr. 257, 518 P.2d 1353].)

Initially, defendant must make "a showing of good cause or plausible justification" for inspection of the material sought. To entitle a defendant to pretrial discovery of any nonprivileged information, he must show that he cannot readily obtain the information from any other source and that the information will assist him in preparing his defense or that it might lead to the discovery of evidence. (*Hill* v. *Superior Court, supra,* 10 Cal.3d 812, 817.)

However, discussing the discretion vested in the trial court, the Supreme Court in *Hill* stated: "In determining whether to grant a motion for discovery the trial court may consider, inter alia, the timeliness of the motion." (*Id.,* at p. 821.)

The record indicates that the discovery in question was initiated after the prosecution rested (after more than a week of trial); that the two officers whose personnel and unit files were sought were not on the People's witness list, but were known to the defendants and on their witness list from the inception of the trial; and that the defendants failed to show how the requested material, at that time, would be

relevant (i.e., either as admissible evidence or as information which would assist defendants in preparing their defense). On this record the trial court did not abuse its discretion in granting the prosecution's motion to quash the subpoena.

 Finally, defendants contend that the trial court erred in instructing the jury on justifiable homicide. There was evidence that after the escape an officer had his gun out and that Cummins heard someone say "Stop or I'll shoot." In this context and in light of defendants' assertions of official threats or harassment, the jury may well have questioned whether the officers pursuing escaping felons could use a deadly weapon. (See CALJIC No. 5.26.) While the instruction lacked constructional precision as to the facts of this case, there being no homicide, it was not prejudicial.

Judgment affirmed.

Gardner, P. J., and McDaniel, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied July 21, 1977.