Filed 3/19/15  P. v. Palazuelos CA2/3

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(a).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115(a).

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>JUAN CARLOS PALAZUELOS,<br><br>　　　Defendant and Appellant. | B255732<br><br>(Los Angeles County<br>Super. Ct. No. BA399859) |

APPEAL from a judgment of the Superior Court of Los Angeles County, Edmund W. Clarke, Jr., Judge.  Affirmed.

Kenneth H. Lewis; Stephen G. Rodriguez, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Gerald A. Engler, Chief Assistant Attorney General, Lance E. Winters, Senior Assistant Attorney General, Steven D. Matthews and David E. Madeo, Deputy Attorneys General, for Plaintiff and Respondent.

Juan Carlos Palazuelos appeals from his conviction and sentence on charges of kidnapping for ransom and carjacking. Palazuelos contends the trial court erred by refusing to instruct the jury on the defenses of duress and necessity. We find no error, and affirm.

## BACKGROUND

1. *The Evidence at Trial*

Farhad Kangavari was a textile trader living in Los Angeles County with his wife and children. In 2011 he began working with Palazuelos to launder drug money. Palazuelos lived in Culiacan, Sinaloa, Mexico. Money was delivered to Kangavari's office in California. Merchandise was bought with the money and then sent to Mexico, where it was sold for pesos. According to the Drug Enforcement Administration, Mexican drug cartels such as the Sinaloa drug trafficking organization use this trade-based method to launder proceeds from narcotics sales.

In October 2011, merchandise Kangavari had bought with more than $300,000 obtained from Palazuelos was hijacked. Palazuelos held Kangavari responsible. In the spring and early summer of 2012, Kangavari paid Palazuelos $400,000 -- a third more than the loss -- but Palazuelos was not satisfied. He told Kangavari that there was a lot of pressure on him in Culiacan and that "people" there were asking for "interest."

On July 10, 2012, Palazuelos called Kangavari around 8:00 or 9:00 p.m. and told him to go pick up some money. Palazuelos told Kangavari that he would send someone to his office the next day to get the money. Kangavari believed Palazuelos was calling from Mexico, because he had never known Palazuelos to come to the United States. Another person then called Kangavari and told him to drive to Palmdale and meet a green Jeep.

Unbeknownst to Palazuelos, Kangavari had been working with the DEA since May 2012. Kangavari notified his DEA contacts of Palazuelos' call. DEA agents told Kangavari to meet them at a McDonald's. The agents then followed Kangavari as he drove in his Prius to meet the Jeep in a dark parking lot in Palmdale. Kangavari stopped his Prius next to the Jeep and got out. A man later identified as Paul Quintero got out of

the Jeep, took a gun out of a duffel bag, put it to Kangavari's stomach, and told him to get back into his car. Kangavari tried to grab the gun and push it away but a second man -- later identified as Jesus Omar Flores-Rios -- "grabbed [him] from the back." Quintero and Flores-Rios put Kangavari in the back seat of the Prius and told him to put his head down. Moments later, a silver Hyundai with Sinaloa license plates pulled up in front of the Prius and screeched to a stop.

The Prius and the Hyundai drove out of the parking lot. Agents followed the cars to a house about eight blocks away. Quintero and Flores-Rios took Kangavari into the house. They put Kangavari in a bedroom and told him there was someone who wanted to meet him. To Kangavari's surprise, Palazuelos walked into the room. Palazuelos was very angry. He kicked Kangavari in the back. Palazuelos chained Kangavari's legs. The men made him drink something. The drink made him very relaxed.

Palazuelos said he wanted money and he asked Kangavari for his home telephone number. Palazuelos called someone in Mexico on a two-way radio and gave him Kangavari's home number. Palazuelos demanded a million dollars. Palazuelos told Kangavari, "You stay here until your wife is gonna transfer the money. And if you don't, I will kill you and I will go after all of your family. I will kill all your family." Palazuelos told Kangavari that if he paid he would shoot only him and not his family. Palazuelos said that -- if the money was not there when the bank opened at 9:00 a.m. -- they would start cutting off his fingers.

Around midnight, someone called Kangavari's wife Veronica from Mexico City. A man told her in Spanish, "We have your husband, and right now we are taking him here to Mexico." He continued: "You need to pay, because your husband owe[s] money, and you have to pay. And if you don't pay, we're gonna kill him. You understand that?" The caller also told Veronica that, if she did not pay, they were going to "get [her] sister." The caller knew Veronica's sister's name. He told her not to call the police. He said he would call again in the morning and she "better be ready." Veronica called the DEA. She also called her sister to confirm that she was alright.

3

Around 8:00 a.m. the next morning, Palazuelos and Flores-Rios came out of the Palmdale house and drove off in the Hyundai. Quintero stayed in the house with the gun to guard Kangavari. Authorities stopped the Hyundai and detained Palazuelos and Flores-Rios. DEA officer Jesse Perez interviewed Palazuelos. Palazuelos said that Kangavari was in the house, alive, under armed guard. Palazuelos referred to Kangavari as "el judio," or "the Jew" in Spanish. Palazuelos said Kangavari owed him a million dollars and, if he went free, Palazuelos did not want to live anymore. Palazuelos told Perez that, if Kangavari did not pay what he owed, he had planned to take him to Mexico and kill him. Palazuelos also said that, if he had been in the house when police arrived, he would have killed Kangavari and then let the police kill him. Perez did not recall Palazuelos saying anything about any repercussions he would face in Mexico if Kangavari did not pay his debt.

Agents used a ram to get in the front door. They heard muffled screaming and crying. The agents broke open a locked bedroom door and found Kangavari, his ankles bound with a chain and lock. Kangavari's wrists were bound with tape. He had wet his pants. Under a backpack in the living room, officers found a loaded semiautomatic handgun.

Palazuelos testified at trial that he was born and raised in Culiacan, Sinaloa, one of ten children. He, his mother, and his siblings still lived there in 2012. The family was known in the town. In 2011, Palazuelos started transacting business with Kangavari, who he called Paco. Palazuelos got funds from exchange houses, which were operated by the cartel. By March or April 2012, Kangavari owed Palazuelos more than a million dollars. At the end of March, Palazuelos met with Kangavari in Mexico. Cartel members "Jose" and "Pocho" were there too. Kangavari promised to pay the money he owed. Kangavari paid $200,000 in mid-April and another $200,000 at the end of June.

At some point, people who Palazuelos and his family believed to be cartel members went to his mother's house in Culiacan. Jose had threatened Palazuelos that he was going to kill him. Palazuelos gave Jose and Pocho his house, his cars, several

4

tons of shrimp from his seafood business, and the proceeds of a bank loan. According to Palazuelos, the money exchange, in turn, owed money to a man named Chiquilin. Cartel members learned that Kangavari had sold some property. They believed -- Palazuelos said -- that Kangavari had given the proceeds to Palazuelos who had then "stolen" some of the money rather than passing on the full amount. Palazuelos' call to Kangavari on the night of July 10 was a trick to get him to go to the Palmdale location so that Palazuelos could call Jose on the radio and have Kangavari verify that he had not given Palazuelos more than the $400,000. Palazuelos testified that Jose told him, "You're the one who's gonna go and prove to me you didn't steal that money." Palazuelos said Jose asked him if he would like to see his mother in the back of a car or in the river, and that he threatened, "You have a lot of brothers to choose from." Palazuelos did not know if Jose had killed anyone but there had been "deaths around him."

Palazuelos admitted on cross-examination that he had bought the chains and tape the day before, and that he had chained Kangavari's ankles and bound his wrists. Palazuelos testified that he had taken a bus for three hours from Culiacan to Mochis, then picked up a car and driven six hours to Hermosillo, Mexico. In Hermosillo, Palazuelos met a friend to help him with the ten-hour drive to Tijuana. Palazuelos and his friend waited for two or three hours in line to cross the border and then drove north to Los Angeles. Palazuelos did not know Quintero or Flores-Rios before July 10, but he talked to them on the telephone and told them to wait for him at the freeway entrance. Palazuelos, in the Hyundai, then followed the two to the parking lot in Palmdale.

Palazuelos admitted at trial that Kangavari had been kidnapped, chained, and held against his will. Palazuelos said the plan all along was to kidnap Palazuelos and make his wife pay ransom. Palazuelos testified that Jose had told him to go to Palmdale, "grab" Kangavari, and have him tell Jose on the radio that he had not paid Palazuelos the proceeds from the property sale. Palazuelos never asked any police or authorities -- in Mexico or in the United States -- for help in protecting himself or his

5

family from the cartel. From his services for the cartel, Palazuelos received commissions of 2.5%. He helped the cartel launder ten million dollars.

Palazuelos' older brother Miguel testified that in March 2012 people came to his mother's home in Culiacan looking for Juan Carlos. They said he "had a pending account" with them. The family moved Palazuelos' mother and sisters out of their home because of fear. After Palazuelos was arrested in California, people came to the family home in Culiacan and said the family needed to start selling property to pay the cartel. Miguel testified that no one made specific threats to harm the family but that in Sinaloa there was no need to be specific. Miguel said the family had made several payments to the cartel, totaling about $180,000. No one from the cartel had actually injured anyone in the family.

2. *The Jury Instructions*

Defense counsel asked the trial court to instruct the jury on both duress (CALCRIM 3402) and necessity (CALCRIM 3403). The court declined. The judge noted that the duress cases "refer to immediacy as being short-term, readily identifiable outcomes, and not future harm." The court gave examples of duress: "a gun to the head," or "[a] person already kidnapped and being tortured, whose life is being threatened with a time limit placed." By contrast, the evidence in this case -- the court noted -- was "I know how bad these guys are and I know what they'll do to me if they continue to be unhappy with me." The court said, "[T]here was never a point when his choice was 'If I don't commit a crime against Mr. Kangavari, I die now or my mother dies now.' " Palazuelos, the court observed, "was not facing an immediate threat of death to him, or someone close to him, at the time that he drove up [from Mexico]. At the time he left his home. When he arrived here. . . . The risk was there, but there's no certainty to that. There's no immediate risk that that's going to happen. It's been going on for a year. He owed money. It's been going on for months he's been putting people off."

As for the necessity defense, the court noted the evidence did not support element number six: that the defendant did not substantially contribute to the

6

emergency that created the necessity. The judge said, "If [Palazuelos] had engaged only in legal commerce, then this never would have happened. . . . So he has contributed to the emergency by his own illegal conduct." The court was not persuaded by the defense suggestion that "because I do business with criminals, I should now be protected from the outcomes of doing business with criminals by the emergencies that those criminals create when they're not happy with my behavior." The judge added, "In my view, the emergency exists because the people who claim they have a debt owed to them are willing to work outside the law to collect it. And the defendant knew that. He chose these people to deal with. So he contributed to that emergency by doing business with them." The court concluded, "I really feel the emergency is created here by the choice of business partners and the nature of the business chosen. And that once you do that, you cannot use necessity as a defense anymore. Otherwise, we would be basically opening up our courts to all manner of mobs and criminal activities who choose to work their problems out partly here and partly on the streets."

### 3.  *Palazuelos' Conviction and Sentence*

The jury convicted Palazuelos of kidnapping for ransom and carjacking. (The jury acquitted Palazuelos on a third charge of assault with a semiautomatic firearm.) The court sentenced Palazuelos to life on the kidnapping count, with a minimum eligible parole date of seven years. On the carjacking count, the court sentenced Palazuelos to the midterm of five years but stayed the punishment under Penal Code section 654.

### DISCUSSION

A trial court must instruct on any defenses on which the defendant relies or that are supported by substantial evidence and not inconsistent with the defendant's theory of the case. (*People v. Boyer* (2006) 38 Cal.4th 412, 468-469; *People v. Martinez* (2010) 47 Cal.4th 911, 953.) Substantial evidence is "evidence sufficient for a reasonable jury to find in favor of the defendant." (*People v. Salas* (2006) 37 Cal.4th 967, 982.) Reviewing courts independently review questions of whether the trial court erred by failing to instruct on defenses. (*People v. Cook* (2006) 39 Cal.4th 566, 596.)

7

### 1. *Palazuelos Was Not Entitled to an Instruction on Duress as a Defense*

A person who acts "under threats or menaces sufficient to show [he] had reasonable cause to and did believe [his] li[fe] would be endangered if [he] refused" has not committed a crime. (Penal Code, § 26, subd. Six.) Duress negates an element of the crime charged: the intent or capacity to commit the crime. (*People v. Heath* (1989) 207 Cal.App.3d 892, 900.) The People therefore have the burden of proving that the defendant did not act under duress.

"An essential component of [the duress] defense is that the defendant be faced with a direct or implied demand that he or she commit the charged crime." (*People v. Saavedra* (2007) 156 Cal.App.4th 561, 567; see also *People v. Steele* (1988) 206 Cal.App.3d 703, 706.) The defendant must have responded to an immediate and imminent danger. (*People v. Heath, supra,* 207 Cal.App.3d at p. 900.) "[A] fear of *future* harm to one's life does not relieve one of responsibility for the crimes he commits." (*People v. Lewis* (1963) 222 Cal.App.2d 136, 141; see also *People v. Lo Cicero* (1969) 71 Cal.2d 1186, 1191 (coercion must constitute a present peril, and not a mere threat of future injury.) "The person being threatened has no time to formulate what is a reasonable and viable course of conduct nor to formulate criminal intent." (*People v. Heath, supra,* at p. 900.) The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea. (*People v. Condley* (1977) 69 Cal.App.3d 999, 1012.)

At trial, Palazuelos first testified that no one ever told him to kidnap Kangavari. Then he testified that "Jose" from the cartel told him he had to prove that he had not taken the money and that he (Palazuelos) had to pay him (Jose) his money. Once Palazuelos and his two cohorts had taken Kangavari to the house and tied him up, Palazuelos called Jose on the radio. But Kangavari declined to speak with Jose, saying only, "Tell him that I will pay him tomorrow." Even assuming that this sequence of events could constitute a demand by Jose that Palazuelos kidnap Kangavari and hold him for ransom, there was no substantial evidence that there was an immediate danger

8

to Palazuelos or his family.  As the trial court noted, Kangavari had owed money to Palazuelos and, in turn, to the cartel for months -- from at least October 2011 until July 2012.

Palazuelos argues that Quintero and Flores-Rios were cartel members who had a semiautomatic weapon and they "could, and would have, killed [Palazuelos]" at the house in Palmdale.  There was absolutely no evidence -- much less substantial evidence -- presented at trial of any such danger.  First, Palazuelos himself never testified that Quintero or Flores-Rios threatened him in any way either at the shopping mall parking lot or at the house.  Palazuelos testified that he spoke to them in advance and  told them to wait for him at the parking lot because he had to be there.  Palazuelos and Flores-Rios left the house that evening together to buy beer.  They returned to the house with "a big case of beer."  Kangavari testified that he thought the three men were using drugs together, because he heard "sniffing" and requests such as "Do you have some of those?" and "Can I have some more?"  The next morning, Palazuelos and Flores-Rios left the house together to retrieve the Jeep from the parking lot.

Palazuelos traveled for two days from Culiacan to Los Angeles, taking a bus from his city to another city, then picking up a car, arranging for a travel companion, driving for many hours, and waiting in a long line to cross at the border.  He bought chain and tape in advance, planning to tie Kangavali up.  On this record, the trial court did not err in concluding that Palazuelos *did* have "time to formulate what [was] a reasonable and viable course of conduct" and "to formulate criminal intent."  (*People v. Heath, supra,* 207 Cal.App.3d at p. 900.)

2.    *Palazuelos Was Not Entitled to an Instruction on Necessity*

The defense of necessity is related to -- but distinct from -- the defense of duress.  The duress defense negates an element of the crime:  mens rea.  The necessity defense represents a public policy decision not to punish a defendant despite proof that he has committed a crime.  (*People v. Heath, supra,* 207 Cal.App.3d at p. 901.)  With necessity, the threatened harm is in the immediate future, permitting a defendant to

balance alternative courses of conduct.  (*People v. Condley, supra,* 69 Cal.App.3d at pp. 1009-1013.)

For example, in *People v. Saavedra* (2007) 156 Cal.App.3d 561, the defendant was charged with possessing a weapon in prison.  He testified that other inmates had attacked him in the prison yard.  One of the assailants dropped a shank and Saavedra picked it up and put it in his shoe.  Saavedra testified that he wanted to keep the other inmates from getting the weapon and hurting him with it.  The court properly instructed the jury on necessity.  See also *In re Eichorn* (1988) 69 Cal.App.4th 382 (defendant charged with sleeping in a public place should have been allowed to raise necessity defense; defendant presented substantial evidence that he slept in civic center because he had no alternative).

The defendant bears the burden of proving necessity by a preponderance of the evidence.  (*People v. Condley, supra,* 69 Cal.App.3d at p. 1008; *People v. Waters* (1985) 163 Cal.App.3d 935, 937.)  The defendant must prove six elements:  (1) He acted in an emergency to prevent a significant bodily harm or evil to himself or someone else; (2) He had no adequate legal alternative; (3) The defendant's acts did not create a greater danger than the one avoided; (4) When the defendant acted, he actually believed that the act was necessary to prevent the threatened harm or evil; (5) A reasonable person would also have believed that the act was necessary under the circumstances; and (6) The defendant did not substantially contribute to the emergency. (CALCRIM 3403; *People v. Pena* (1983) 149 Cal.App.3d Supp. 14, 25-26; *People v. Pepper* (1996) 41 Cal.App.4th 1029, 1035.)

Here, the trial court properly concluded that Palazuelos was not entitled to a necessity instruction because he *had* substantially contributed to the claimed "emergency" of needing to explain to cartel representatives where the money had gone and to force Kangavali to pay.  The testimony at trial -- including Palazuelos' own admissions -- demonstrated that Palazuelos had knowingly and willingly entered into business transactions with the Sinaloa cartel, for which he received commissions totaling about $250,000.  Palazuelos admitted that he knew the money was drug money,

10

that he knew the money exchanges for whom he was working were operated by the cartel, that the cartel operated outside the law, that it was illegal to traffic cocaine, and that it was illegal to have the cash proceeds from narcotics trafficking.

" 'Necessity is an affirmative public policy defense, in effect a plea in avoidance and justification, which comes into focus only after all elements of the offense have been established.' " (*People v. Buena Vista Mines, Inc.* (1998) 60 Cal.App.4th 1198, 1204, quoting *People v. Waters* (1985) 163 Cal.App.3d 935, 938.) In *Buena Vista Mines*, the court held that the defendant was not entitled to assert necessity as a defense to a felony charge of violating federal water pollution laws. The defense presented evidence that the mining company had pumped acid-contaminated water out of a holding pond into a creek because it feared the holding pond's earthen walls would not hold. The court rejected that argument, noting that the defendant "stored acid-contaminated water in an inadequately sized open pond and had weeks, if not months, to consider alternative courses of conduct." (*Id.* at p. 1204.) Here, Palazuelos chose to go into business with drug traffickers; when things turned out badly, he could not assert the necessity defense to justify his kidnapping of Kangavali for ransom of one million dollars and his threats to kill Kangavali and his family. *Cf. People v. Kearns* (1997) 55 Cal.App.4th 1128, 1135 (defendant who testified she had been forced to commit robberies by man who had raped and beaten her was not entitled to jury instruction on necessity defense; public policy considerations do not support application of the defense where "[v]iolence justified in the name of preempting some future, necessarily speculative threat to life is the greater, not the lesser evil").

11

## DISPOSITION

The judgment and sentence are affirmed.

### *NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS*

EGERTON, J.*

WE CONCUR:

KITCHING, Acting P. J.

ALDRICH, J.

---

*   Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.