Filed 7/15/13  P. v. Tapia CA5
Received for posting 7/29/13

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE, | F062550 |
| Plaintiff and Respondent, | |
| v. | (Kern Super. Ct. No. BF128470A) |
| RAMON LOPEZ TAPIA, | **MODIFICATION OF OPINION**<br>**[No Change in Judgment]** |
| Defendant and Appellant. | |

BY THE COURT:

It is ordered that the nonpublished opinion filed in the instant case on June 20, 2013, be modified as follows:

The fourth and fifth sentences in the fifth full paragraph, beginning on page 6 and continuing to the top of page 7, are deleted, and in place of those sentences are substituted the following:

"On the way, she drove past the scene of the shooting, saw the emergency personnel, and advised them of Arrellano's gunshot wound.  The police and emergency personnel took Arrellano to the hospital for treatment."

This modification does not change the judgment.

_____
Poochigian, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Gomes, J.

Filed 6/20/13  P. v. Tapia CA5 (unmodified version)

## NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

FIFTH APPELLATE DISTRICT

| | |
|---|---|
| THE PEOPLE,<br><br>　　　Plaintiff and Respondent,<br><br>　　　v.<br><br>RAMON LOPEZ TAPIA,<br><br>　　　Defendant and Appellant. | F062550<br><br>(Kern Super. Ct. No. BF128470A)<br><br>**OPINION** |

APPEAL from a judgment of the Superior Court of Kern County.  John S. Somers, Judge.

Jerome P. Wallingford, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Michael P. Farrell, Assistant Attorney General, Eric L. Christoffersen and Brook Bennigson, Deputy Attorneys General, for Plaintiff and Respondent.

-ooOoo-

### INTRODUCTION

Appellant/defendant Ramon Lopez Tapia sold drugs in Wasco.  Augustine Villagomez and his girlfriend, Cecilia Saldana, purchased methamphetamine from him,

but they were upset because they received a smaller quantity than they had paid for.  A few days after the sale, Villagomez and defendant confronted each other in an alley and fired shots at each other.  Defendant used a nine-millimeter handgun, and he was with a man who had a shotgun.  No one was hurt.  A few days after that shooting, defendant's vehicle followed Saul Arrellano's vehicle through Wasco; Arrellano was driving and Villagomez was in the front passenger seat.  Arrellano had not been involved in the previous drug dispute.  There were multiple gunshots fired from defendant's vehicle into Arrellano's car from two different weapons:  a nine-millimeter handgun and a shotgun.  Villagomez was killed from shots fired from the handgun, and Arrellano was wounded by shotgun pellets.  After the homicide, defendant told a friend that, " '[I]t's done, I shot his head out,' " and that Arrellano had not been the target.

Defendant was charged with count I, first degree premeditated murder of Villagomez (Pen. Code,[1] § 187, subd. (a)), and count II, attempted premeditated murder of Arrellano (§§ 664/187, subd. (a)).  As to both counts, it was alleged that defendant personally and intentionally discharged a firearm causing death or great bodily injury (§ 12022.53, subd. (d)), and that he had served two prior prison terms (§ 667.5, subd. (b)).

At trial, defendant testified that a man named "Chema" and his associate were the gunmen.  Chema was defendant's drug supplier, and Chema was angry at Villagomez because of the methamphetamine dispute.  Defendant relied on a duress defense and claimed Chema and his associate held him at gunpoint, took his gun away from him, and ordered him to drive them to Wasco so Chema could find Villagomez.  Defendant testified Chema threatened to kill defendant and his family if he did not obey his orders.  Defendant testified he never fired any weapons at Arrellano's vehicle; that he thought

---

[1] All further statutory citations are to the Penal Code unless otherwise indicated.

Chema was just going to talk to Villagomez; and he did not know Chema was going to kill Villagomez.

Defendant was convicted of first degree murder of Villagomez. He was found not guilty of attempted murder of Arrellano, and the jury found the personal discharge allegation not true. He was sentenced to 25 years to life.

On appeal, defendant contends the court abused its discretion and violated his constitutional rights when it responded to a series of questions from the jury during deliberations about the impact of his duress defense on the charged offenses. Defendant complains that instead of responding to the questions, the court improperly ordered the prosecutor and defense counsel to reopen their closing arguments and address the issues raised by the jury's questions. Defendant also contends his life term constitutes cruel and/or unusual punishment because he was convicted of first degree murder as an aider and abetter. Finally, defendant argues the court should have ordered the probation report's factual summary stricken because it was inaccurate. We affirm.

## **FACTS**

In May 2009, defendant sold methamphetamine to Augustine Villagomez and his girlfriend, Cecilia Saldana.[2] According to Saldana, defendant did not give them the full quantity of methamphetamine that they had paid for. Villagomez called defendant and asked for the rest of the methamphetamine. Defendant said he was not going to give them any more methamphetamine, and they argued about the issue.

**The shooting in the alley**

On May 15, 2009, Saldana was driving her car in Wasco with Villagomez and another man. They saw defendant driving in his car. According to Saldana, she followed defendant's car into an alley because they wanted to "make peace" with him about the

---

[2] Villagomez and Saldana were members of the Varrio Wasco Rifas gang. Saldana had a prior conviction for child endangerment in 2007.

3.

drug argument. Villagomez was carrying a .25-caliber handgun. Both Saldana and defendant parked in the alley. Villagomez got out and walked to defendant's car. According to Saldana, defendant got out of his car and began shooting at Villagomez. Villagomez returned fire and ran back to Saldana's car. Villagomez got into the car and Saldana drove away.[3] Saldana's car was hit by defendant's gunshots.[4]

Jose Hinojosa, who knew defendant, was working in a nearby storage shed adjacent to the alley. Hinojosa heard multiple gunshots from a small caliber weapon, most likely a .25- or .22-caliber pistol. He then heard the sound of "big shots" fired from a nine-millimeter. Defendant ran into the shed and told Hinojosa that some "kid" tried to rob him in the alley. Defendant had a semiautomatic handgun, which appeared to be either a nine-millimeter or a .45-caliber. Defendant was with another man who had a shotgun. Hinojosa described the other man as Hispanic, bald, and heavy-set. Hinojosa had never seen the other man. Defendant reloaded his handgun. He was upset and said he was going to take care of business, and left with the other man.

Around 11:30 p.m., a deputy responded to the alley on the dispatch about a possible shooting. No one was there, and the cars were gone. The deputy found several nine-millimeter and .25-caliber shell casings, a .25-caliber fired bullet, and broken glass.

---

[3] Based on the shooting in the alley, Saldana was later arrested for attempted murder of defendant, assault with a deadly weapon, and gang charges. She also had charges pending against her for possession of methamphetamine for sale. She pleaded no contest to active participation in a criminal street gang (§ 186.22, subd. (a)), for a two-year prison term and her agreement to testify truthfully in this case. The other charges were dismissed. Saldana, who gave birth to Villagomez's child after he died, testified at trial as a prosecution witness under a grant of immunity. She was later recalled as a defense witness.

[4] After Villagomez was killed, the deputies inspected Saldana's vehicle, which was parked in a garage. The deputies observed bullet strikes into the car and a shattered back window, consistent with her story about the bullets hitting her car during the alley shooting.

4.

The nine-millimeter and .25-caliber casings were in separate clusters, about 10 yards apart from each other.

**The homicide**

In the late afternoon of Sunday, May 17, 2009, Saul Arrellano was driving his black Honda Passport SUV on D Street in Wasco. Villagomez was sitting in the front passenger seat.

Lucia Reyes and Maria Mercado were standing together on Fourth and D Streets. Reyes saw a dark colored vehicle drive by. The dark vehicle was later identified as Arrellano's black SUV. It was being followed by a green vehicle, later identified as defendant's SUV. Defendant's vehicle was traveling very slowly. Reyes heard loud noises and thought they were firecrackers. Defendant's vehicle turned onto Fifth Street and the tires screeched. Arrellano's SUV was still in front of defendant's vehicle, and it crashed into another car.

Mercado and Reyes saw someone get out of Arrellano's vehicle and run away. No one got out of defendant's vehicle. However, Reyes saw a hand holding an object out of the passenger window of defendant's green SUV. Reyes saw smoke and flashes, and heard additional "firecracker" sounds. Mercado heard gunfire and saw smoke from several gunshots.

Reyes could not see into defendant's green SUV, but she believed there were two people inside because the driver would not have been able to extend his hand out of the passenger window.

Robert Ornelas lived on the corner of D and Fifth Streets. He heard four or five gunshots and looked out the window. He recognized Arrellano's black SUV, and testified that it was "drifting" across the street and into the intersection. Arrellano's SUV crossed the intersection, went up on the curb, bumped into a parked car, and stopped. Ornelas ran outside and checked Arrellano's car. The driver's side window was broken. There was one person in the vehicle, sitting in the front passenger seat, and he was later

5.

identified as Villagomez. Villagomez was slumped over, and he was not breathing. He had been shot multiple times in his upper body. Ornelas called 911.

Another witness later informed a deputy that the witness heard gunshots and saw a green van traveling on D Street. The witness saw a man running along the side of the green van. The witness recognized the man, and thought he lived on D Street. The man fired four rounds into the passenger side of the green van. He dropped the gun and then ran to a residence on D Street. The witness later saw the man's father walk over and pick up the gun.[5]

**Arrellano runs to his parents' house**

Arrellano's parents lived on D Street, just south of 5th Street. Arrellano's father testified he was sitting outside his house that afternoon and saw his son's black SUV drive by at a high rate of speed. It was being followed by a green SUV. He could not see who was in the green vehicle.

About 30 seconds after seeing the two vehicles, Arrellano's father heard five or six gunshots. About three minutes after hearing the gunshots, Arrellano ran to his parents' house.

Arrellano was bleeding from a gunshot wound, and had a "big hole" in his left shoulder. There were shotgun pellets in the wound. Arrellano told his father: "[T]hey shot me." Arrellano said he had "only seen the barrel" through the window "and then he got down when it hit."

Arrellano's sister, a health care professional, tried to stop the bleeding. Arrellano told his sister that he was shot; that he did not know who did it; and that Villagomez was dead. Arrellano's sister cleaned the wound and decided to drive him to the hospital. On

---

[5] As we will explain, *post*, the record suggests that Arrellano got out of the black van, ran alongside the green van and fired shots into it, and then ran to his parents' house on D Street.

the way, she drove past the scene of the shooting, saw the emergency personnel, and advised them of defendant's gunshot wound. The police and emergency personnel took defendant to the hospital for treatment.

Arrellano's father testified that he walked to the intersection, looked into Arrellano's car, and saw Villagomez's body. Arrellano's father testified that he found his son's cell phone on the street, and he picked it up. He insisted that he did not find or pick up a gun.[6]

**The initial investigation**

When the sheriff's deputies arrived at D and Fifth Streets, they found Arrellano's black SUV stopped against another vehicle. Villagomez's body was slumped over in the front passenger seat. There were bullet holes on the driver's side door, and a large bullet hole in the driver's side window.

Cecilia Saldana, Villagomez's girlfriend, arrived at the scene and threw herself on Villagomez's body. The deputies had to escort her away from the area to preserve the crime scene. Saldana said that Villagomez's family called and told her about the shooting.

Villagomez died from multiple gunshot wounds to his head, neck, chest, and back. The bullets entered his lung and spine, and most of them lodged in his body. The wounds did not appear to be inflicted by a shotgun. The bullets and fragments recovered from his body appeared to be from a large caliber weapon, possibly a nine-millimeter.

While the deputies were investigating the scene, Arrellano arrived in his sister's car, and said he had been shot in the left shoulder. A deputy who looked at the wound thought it was inflicted by a shotgun. Arrellano was taken to the hospital for treatment. He survived the wound to his left shoulder.

---

[6] Robert Ornelas testified that Arrellano's father was holding a cell phone and not a gun.

Arrellano's father testified that sometime in August 2009, after Arrellano recovered from his wound, Arrellano and his wife left Wasco and moved to another state. At the time of trial, Arrellano's father said he did not know where they were.

**Additional investigation**

On June 10, 2009, Sergeant Adrian Olmos interviewed Jose Hinojosa about his contacts with defendant. Hinojosa said that he spoke to defendant after Villagomez was killed, and defendant said, " '[I]t's done, I shot his head out.' " Defendant said Arrellano had also been shot. Defendant also said Arrellano was not the target, and defendant "had to do what he had to do."[7]

Hinojosa said defendant had a friend named "Chema" who lived in Earlimart. Hinojosa said that Chema was not the man with the shotgun who ran into his shed with defendant during the alley shooting.

Arrellano's black SUV was examined, and there were five bullet holes on the driver's side door. The bullets entered from the outside at a slightly downward angle. It was possible that the driver's side door was open during part of the shooting. It was also determined that two weapons were fired into Arrellano's vehicle: a nine-millimeter handgun and a shotgun.

**Defendant's postarrest statement**

On June 25, 2009, defendant was arrested in Monica Calderon's trailer in Lemoore. Sergeant Olmos interviewed defendant at the Lemoore Police Department. Defendant was advised of the *Miranda*[8] warnings and agreed to answer questions.

Defendant admitted he sold methamphetamine to Saldana and Villagomez. Defendant said he called Villagomez an "old man" during the meeting. Villagomez

---

[7] At trial, Hinojosa testified that he never saw defendant after the alley shooting, and he never told anyone that defendant said he shot someone's head off.

[8] *Miranda v. Arizona* (1966) 384 U.S. 436

became very upset and wanted to fight with defendant. Saldana told Villagomez to calm down, and they left. Defendant was asked if they argued about drugs, and defendant said they argued about something else.

Defendant was asked about the shooting in the alley. Defendant said he was driving in Wasco when he realized Saldana was following him. Defendant parked at an apartment complex. Villagomez walked up to the car, pointed a gun at his head, and said, " 'I came to kill you.' " Villagomez started shooting at defendant. Defendant got out of the car and returned fire. Villagomez ran back to Saldana's car and they drove away. Defendant said he did not know why Villagomez tried to kill him. Defendant said he did not report the shooting because he felt the deputies would not do anything about it.

Defendant said he knew about the Varrio Wasco Rifas gang in Wasco. A person named "Yoyo" was the gang's "shot caller." Yoyo tried to "tax" defendant for selling drugs in Wasco, but defendant never paid him. Defendant said he told Yoyo that Villagomez tried to kill him. Yoyo said he would talk to Saldana and Villagomez to stop, but defendant did not know if Yoyo actually had the conversation.

Defendant said he went to a female friend's house in Shafter after the shooting in the alley. There were two unknown Hispanic men at the house: one was light-skinned and the other was dark-skinned. Defendant said he had never seen these men. The dark-skinned man pointed a gun at defendant and said defendant had to drive them around Wasco and hunt down Villagomez. The two Hispanic men said they did not like Villagomez or Saldana because of a prior drug transaction. Defendant said he did not know why the two men wanted to kill Villagomez.

Defendant said on the day of the homicide, he drove the two men to Wasco in his green SUV and helped them look for Villagomez. The light-skinned man was sitting in the front passenger seat, and the other man was in the rear passenger seat. They saw Arrellano's vehicle, and defendant pulled up next to it. Defendant said Arrellano was

9.

driving. Defendant said the light-skinned man fired a shotgun, and the other man fired several rounds from a semiautomatic handgun into Arrellano's vehicle.

Defendant said he fled from Wasco after the shooting because "gangsters from Wasco" wanted to kill him.[9] Defendant was asked about a nine-millimeter handgun which was found in Calderon's trailer when he was arrested. Defendant said he had recently stolen the gun from an unknown man in Shafter. Defendant said he intended to sell the gun to get some money and that defendant said he did not use that gun during the alley shooting or the homicide. Defendant said he got rid of the gun that he used for the alley shooting.[10] Defendant said the shotgun used during the homicide did not belong to him, and he did not know what happened to it.

Upon further questioning, defendant admitted that he had purchased a shotgun from Manuel "Lefty" Macias, but he only kept it one day. He returned it to Macias and got his money back. Defendant denied that a shotgun was used during the homicide.

As the interview continued, defendant said the light-skinned Hispanic was named "Chema." Defendant also said that he was forced to go to Wasco by the dark-skinned man. Defendant believed both men were from Earlimart. Defendant said both men were "Mafia-type persons," and he believed they were upset at Saldana for some reason. Defendant said the dark-skinned man actually hated Saldana.

Defendant said after the shooting in Wasco, he drove back to Earlimart, dropped off the two Hispanic men, and left his green vehicle in Earlimart. Defendant believed

---

[9] Defendant said after the homicide, he asked his family to contact law enforcement officers for him. Defendant's family was also interviewed, however, and they never said that defendant asked them to contact the police.

[10] It was later determined that the nine-millimeter bullets recovered from Villagomez's body, and from the homicide scene, were not fired from the nine-millimeter handgun that was found when defendant was arrested.

that "gangsters" may have stolen the vehicle. The officers went to the location described by defendant but could not find the vehicle.

Defendant was asked why he did not come forward to tell his version of the story. Defendant said he believed the two Hispanic men who killed Villagomez "would kill him." They threatened him, and they said "if he spoke his family would be killed." Defendant said he had been trying to stay away from places where he was known, because he believed "gangsters" from Wasco were going to kill him after the homicide.

After obtaining defendant's statements, deputies attempted to locate Chema in Earlimart, but they could not find anyone who matched defendant's description of that person.

## DEFENSE EVIDENCE

### Criminalist Jeanne Spencer

Jeanne Spencer testified that she examined Arrellano's vehicle and determined that a shotgun and a handgun of unknown caliber were used to fire shots into it. One copper jacket was recovered from the front passenger door of Arrellano's SUV, along with several metal fragments inside the car and the driver's door.

Spencer testified five bullets entered the driver's side door, and two hit the window. One hit the pillar of the passenger-side door jamb. The trajectory of the bullets which entered from the driver's side appeared to be a slightly downward angle. Based on the angle of some of the shots, the driver's door could have been slightly open when the shots were fired, the driver could have been hunched down, or a victim could have been in the way.[11]

Spencer testified the shotgun blast appeared to have been fired into Arrellano's vehicle from the driver's side, and a cluster of pellets hit the pillar between the front and

---

[11] Arrellano, who was driving the black SUV, was wounded in the left shoulder. He told his father that he got down when the shots were fired.

11.

rear passenger doors. The shotgun pellets appeared to have traveled from the front of the driver's side window towards the back portion of the front passenger window, likely resulting in the large hole in the driver's side window. There was no evidence that more than one shotgun blast caused the damage in the SUV. However, it was possible that more than one shotgun blast was fired into the vehicle and hit someone.

**Cecilia Saldana**

Cecilia Saldana was recalled as a defense witness. Saldana testified she was not in Arrellano's vehicle during the homicide. Someone called her about the shooting, but she could not remember who made the call. Saldana did not remove a weapon from the vehicle when she threw herself on Villagomez's body. Saldana testified that she did not sell methamphetamine, buy drugs from defendant, or tell Villagomez to kill defendant. Saldana described Yoyo as a "mutual friend/acquaintance," but said she did not sell drugs or move weapons for him. She did not remember anything about the shooting in the alley. She never saw Villagomez with a gun. Saldana denied that she sold drugs while housed at the Lerdo facility, or that she threatened Villagomez's family after the shooting in the alley. Saldana testified she was not part of a gang, and she did not sell drugs or collect taxes for the gang. She pleaded to the gang offense because she "followed the crowd."

**DEFENDANT'S TESTIMONY**

Defendant testified that he was convicted of possession for sale in 1997 and served a prison term. Defendant met Chema in January or February 2009, when he bought drugs from him. Chema asked if he wanted to sell methamphetamine for him. Defendant agreed and sold drugs for Chema in Wasco.

Defendant testified that Chema lived in a trailer in Earlimart with his wife and young children. He thought Chema's name was "Jose Maria," but he did not know his last name. Defendant used to have Chema's cell phone number, but he did not know it anymore.

12.

Defendant testified he met Yoyo, Saldana, and Villagomez while he was working for Chema. Defendant often sold drugs to Saldana. Saldana and Yoyo also worked together to sell drugs. Saldana told defendant that she was able to get drugs into the Lerdo detention facility. Defendant often saw Saldana with two "gun-packing" men: Villagomez and another man.

Defendant testified that Saldana and Yoyo wanted him to pay "taxes" for selling drugs in Wasco. Defendant told Chema about their demand, and Chema said not to pay them. Chema gave defendant a nine-millimeter handgun for protection from the "cholos" who wanted him to pay "taxes."

Defendant said he sold drugs to Saldana and Villagomez in May 2009, but "there was just very little missing." Villagomez also became angry because defendant mispronounced his name. Saldana called him at 4:00 a.m. and complained about the missing drugs. Defendant was with Chema when he received the call. Chema told defendant not to give them anything. Defendant, Chema, and another man drove to a meeting with Saldana and Villgomez. Defendant and the other man got out of the car and walked to Saldana's car. Chema stayed in the car and aimed a shotgun at Saldana. They gave additional drugs to Saldana and Villagomez. The other man told Saldana not to bug defendant anymore, and they left.

**The shooting in the alley**

Defendant testified that sometime after delivering the rest of the drugs, he was driving to Hinojosa's house and parked in the alley. He noticed Saldana's car parked behind him. Villagomez walked up to defendant's car, pointed a gun at defendant's head, and said, "I've come to kill you." Defendant bent down to get his gun from under the seat. Villagomez ran toward the rear of defendant's car and fired four shots into the rear window, which shattered the glass. Defendant got out of his car, fired back, and then went into Hinojosa's house to reload. As he was reloading, a "boy" arrived with a shotgun. The boy lived nearby and was Chema's friend. Defendant told the boy what

13.

happened, and the boy wanted to chase the gunman. Defendant told him not to. Defendant fled to Shafter and stayed with Monica Calderon.

Defendant testified that his wife called him in Shafter and said that Saldana had appeared at their house. Saldana banged on the door and yelled for defendant to come out. Saldana was with two "cholos," one of whom had a gun.

Defendant called Yoyo and told him what Saldana had done. Yoyo talked to Saldana and Villagomez, and they agreed to replace the broken window in defendant's car. They also agreed to settle the matter as friends.

Defendant testified that after the shooting in the alley, he realized that he was "involved in things that you could say were leading me down the wrong path." Defendant called Chema and said that he wanted to end their relationship, and he would return Chema's money and drugs. Chema was upset but agreed to meet him in Shafter to settle things. Chema was also upset with Saldana and Villagomez, because their actions led to defendant's decision to stop selling drugs for him.

**Chema orders defendant to drive to Wasco**

Defendant testified that Chema and another man arrived in Shafter to pick up Chema's drugs and money from defendant. Chema's associate was not the same man who had appeared with a shotgun after the shooting in the alley.

Defendant, Chema, and his associate got into defendant's green van, and defendant returned Chema's money and drugs. Chema told defendant that they were going to Wasco to look for Villagomez. Defendant protested. Chema's associate held a gun to defendant's back, and took defendant's gun away from him. "They told me to take him to Wasco. I had no other choice but to take them to Wasco…."

Defendant testified that he drove them to Wasco. Defendant recognized Arrellano's black vehicle but did not know who was sitting in the passenger seat. Chema told defendant to follow them. Defendant asked why. Chema said that if he did not

14.

follow them, "it will be your family." Defendant, who had six children, believed that "if I didn't keep driving they would kill my children or kill me, too."

Defendant testified that he knew Chema and his associate had weapons, but he thought Chema just wanted to speak to Arrellano and Villagomez. As they followed Arrellano's car, they could see that Villagomez made "boxing" motions and "signs back to our direction towards Chema. He was swinging his fists basically like he was going to kick his ass." Defendant again asked Chema why they were following them, and whether the other men were armed. Chema's associate put the gun against defendant's back and said to keep following them.

**The homicide**

Defendant testified that Arrellano pulled over to the curb. Defendant parked behind them because he thought Chema wanted to talk. However, Chema told defendant: "[P]ass him, dumbass."

Defendant testified he drove past Arrellano's car. Chema and his associate started firing into Arrellano's car. Chema had a shotgun and his associate used another weapon. (RT 508) Defendant testified the shotgun belonged to Chema, but defendant had previously kept it for him, and had returned it to Chema a few days earlier.

Defendant noticed that Arrellano bent down during the shooting. Defendant accelerated past Arrellano because he did not want anyone to be killed. Chema said: "[G]et back there, dumbass," and added, "I don't want to leave any witnesses.…" Chema said that if defendant did not do what he said, then Chema would kill defendant on the spot.

Defendant testified that he "went back [to Arrellano's vehicle] and right away I went forward again and it happened all very fast, very quickly." Chema and his associate continued to fire their guns into Arrellano's vehicle.

After they finished shooting, Chema told defendant to hit the gas. Defendant accelerated and drove to Earlimart. During the drive, Chema and his associate discussed

15.

whether they should kill defendant. Chema finally said they were going to let defendant go because he would be blamed for killing Villagomez, since defendant had been involved in the alley shooting a few days earlier. Defendant dropped off Chema and his associate, dumped his green van, and stayed with friends. He never saw Chema again.

Defendant testified he never saw Hinojosa after the homicide, and he never said that he had blown off Villagomez's head. Defendant claimed that the deputies beat him up after he was arrested in Lemoore.

## REBUTTAL

Sergeant Olmos testified that he interviewed defendant after he was arrested. Defendant never mentioned Chema's name. Defendant never said that he sold drugs for Chema, or that he told Chema that he wanted to stop selling drugs for him. Sergeant Olmos testified that he brought up Chema's name during the interview and asked defendant if he knew someone named Chema. Defendant initially denied knowing that person. Toward the end of the interview, defendant said he knew someone named Chema who lived in Earlimart, but he did not offer any details and said he did not know that person very well.

## VERDICT AND SENTENCE

After a jury trial, defendant was convicted of first degree murder of Villagomez. He was found not guilty of the attempted murder of Arrellano. The jury found the personal discharge special allegation not true. The court dismissed the prior prison term enhancements. Defendant was sentenced to 25 years to life for murder.

## DISCUSSION

### I. The court's responses to the jury's questions

As explained, *ante*, defendant testified that Chema and his associate forced him at gunpoint to drive to Wasco and find Villagomez. However, defendant insisted that he thought Chema only wanted to talk to Villagomez, that he did not know what Chema was going to kill him, and he only drove the vehicle because of Chema's threats against him.

16.

During deliberations, the jury asked two questions about the interplay between murder, duress, and aiding and abetting. The court responded to one question and asked the jury to clarify the other question. When the jury asked two more questions on the same topics, the court decided to permit the parties to reopen their closing arguments to address the issues raised by the questions. The court believed that a direct response to the jury's questions would be inappropriate because the answers were dependent on the disputed facts of the case. Defense counsel initially asked the court to respond to the questions, but then concurred with the court's decision to have further argument.

On appeal, defendant contends the court committed prejudicial error when it directed the attorneys to give additional arguments on the jury's questions about murder, duress, and aiding and abetting. Defendant contends the court abdicated its duty to respond to the jury's questions. Defendant further contends the court's decision to reopen argument was prejudicial because both the prosecutor and defense counsel misstated the legal principles of aiding and abetting and duress.

We will find that defendant did not object to the court's decision or to the prosecutor's argument. In addition, we will find the court did not abuse its discretion when it decided to permit the parties to give further arguments in response to the jury's questions about aiding and abetting and duress.

In order to address these contentions, we will begin with the legal principles of murder and duress, review the procedural history of the jury's questions and the reopened arguments, and then address defendant's appellate issues.

## A. **Murder and duress**

We begin with the legal principles about the interplay between murder and the duress defense. Section 26 states that "[a]ll persons are capable of committing crimes" except "[p]ersons (unless the crime be punishable with death) who committed the act or made the omission charged under threats or menaces sufficient to show that they had reasonable cause to and did believe their lives would be endangered if they refused."

17.

(§ 26, subd. (6).) " 'The common characteristic of all the decisions upholding [a duress defense] lies in the immediacy and imminency of the threatened action: each represents the situation of a present and active aggressor threatening immediate danger; none depict a phantasmagoria of future harm.' [Citations.]" (*People v. Vieira* (2005) 35 Cal.4th 264, 290 (*Vieira*).) The defendant must show that he acted under immediate threat of harm and reasonably believed his life was in danger, such that the defendant did not have time to form the required criminal intent. (*People v. Heath* (1989) 207 Cal.App.3d 892, 899-901.) "The unlawful acts of the person under duress are attributed to the coercing party who supplies the requisite mens rea and is liable for the crime. [Citation.]" (*People v. Condley* (1977) 69 Cal.App.3d 999, 1012.)

Section 26 contains an important exception: the duress defense does not apply when the defendant is charged with a crime that is "punishable with death." (§ 26, subd. (6).) The California Supreme Court has concluded that this language "excludes all murder from the duress defense[,]" regardless of whether the People seek the death penalty. (*People v. Anderson* (2002) 28 Cal.4th 767, 775-776 (*Anderson*).) The Legislature has statutorily barred the use of the duress defense in such cases for policy reasons. (*Id*. at pp. 778-780; *People v. Son* (2000) 79 Cal.App.4th 224, 234.) "[F]ear for one's own life does not justify killing an innocent person[,]" and "[t]he law should require people to choose to resist rather than kill an innocent person." (*Anderson*, *supra*, 28 Cal.4th at pp. 770, 772.)

It is thus settled that "duress is not a defense to any form of murder." (*Anderson*, *supra*, 28 Cal.4th at p. 780.) Duress cannot negate "the elements of malice or premeditation, thereby reducing a first degree murder to manslaughter or second degree murder. [Citation.]" (*Vieira*, *supra*, 35 Cal.4th at p. 290.)

> "Although duress is not an affirmative defense to murder, the *circumstances* of duress would certainly be relevant to whether the evidence establishes the elements of implied malice murder. The reasons a person acted in a certain way, including threats of death, are highly relevant

18.

to whether the person acted with a conscious or wanton disregard for human life. [Citation.] This is not due to a special doctrine of duress but to the requirements of implied malice murder." (*Anderson*, *supra*, 28 Cal.4th at pp. 779-780, italics added.)

"Moreover, because duress cannot, as a matter of law, negate the intent, malice or premeditation elements of a first degree murder, we further reject [the] argument that duress could negate the requisite intent for one charged with aiding and abetting a first degree murder. [Citation.]" (*Vieira*, *supra*, 35 Cal.4th at p. 290.)[12]

"We agree that a killing under duress, like any killing, may or may not be premeditated, depending on the circumstances. If a person obeys an order to kill without reflection, the jury might find no premeditation and thus convict of second degree murder. As with implied malice murder, this circumstance is not due to a special doctrine of duress but to the legal requirements of first degree murder…. Here, the jury found premeditation. In some other case, it might not. *It is for the jury to decide.* But, unless and until the Legislature decides otherwise, a malicious, premeditated killing, even under duress, is first degree murder." (*Anderson*, *supra*, 28 Cal.4th at p. 784, italics added.)

With these principles in mind, we turn to the procedural background for defendant's appellate contentions.

## B.  <u>The charges and instructions</u>

As applied to the instant case, the People did not seek the death penalty against defendant, but he was charged with first degree murder, a crime punishable with death. Thus, the defense of duress was not applicable to count I, first degree murder of Villagomez. (See, e.g., *People v. Son*, *supra*, 79 Cal.App.4th at p. 234.) However, attempted murder is subject to a duress defense, and was thus available for count II, attempted murder of Arrellano.

---

[12] The California Supreme Court has recognized one exception:  duress may provide a defense to murder on a felony-murder theory by negating the underlying felony. (*Anderson*, *supra*, 28 Cal.4th at p. 784.)  This exception is not applicable to this case because defendant was not charged with felony murder.

19.

The jury in this case was instructed on aiding and abetting, that defendant could be guilty of the charged offenses either as the perpetrator or an aider and abettor. (CALCRIM Nos. 400, 401, 402.)

> "To prove that the defendant is guilty of a crime based on aiding and abetting the People must prove that first the perpetrator committed the crime. Second, the defendant knew that the perpetrator intended to commit the crime. Third, before or during the commission of the crime the defendant intended to aid and abet the perpetrator in committing the crime. And four, the defendant's words or conduct did in fact aid and abet the perpetrator's commission of the crime. *Someone aids and abets a crime if he or she knows of the perpetrator's unlawful purpose and he or she specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime,…*" (CALCRIM No. 401, italics added.)

As to count I, the jury was instructed on first degree murder; express and implied malice; and willful, deliberate, and premeditated murder. (CALCRIM No. 520.) The jury was also instructed on second degree murder (CALCRIM No. 521) and voluntary manslaughter as lesser included offenses (CALCRIM No. 570); and that provocation could reduce murder from first degree, to second degree or manslaughter. (CALCRIM No. 522.)

As to count II, the jury was instructed on the elements of attempted murder (CALCRIM No. 600); and attempted voluntary manslaughter as a lesser included offense (CALCRIM Nos. 603, 604).

The jury also received CALCRIM No. 505, that defendant was not guilty of murder, attempted murder, or the lesser included offenses if he was justified in killing or attempting to kill someone in self-defense or defense of another. The instruction expressly stated that the harm or threat of harm had to be from Villagomez or someone associated with Villagomez; Chema was not listed in this instruction.

Finally, the court gave the following version of CALCRIM No. 3402 on duress:

20.

"The defendant is not guilty of *attempted murder* if he acted under duress. The defendant acted under duress if because of threat or menace he believed that his or someone else's life would be in immediate danger if he refused to demand or request to commit the crime. The demand or request may have been express or implied. The defendant's belief that his or someone else's life was in immediate danger must have been reasonable. When deciding whether the defendant's belief was reasonable consider all the circumstances as they were known to and appeared to the defendant and consider what a reasonable person in the same position as the defendant would have believed. A threat of future harm is not sufficient. The danger to life must have been immediate.

"The People must prove beyond a reasonable doubt that the defendant did not act under duress. If the People have not met this burden, you must find the defendant not guilty of attempted murder. *This defense does not apply to the crime of murder....*" (Italics added.)

During the instructional phase, defense counsel objected to the final sentence of CALCRIM No. 3402, that duress was not a defense to murder. Defense counsel argued that phrase was contrary to defendant's testimony and the defense theory of the case, that Chema threatened to kill defendant or his family unless defendant followed his orders to drive to Wasco and find Villagomez. The court acknowledged defense counsel's objection, but replied that *Anderson* held that duress could never be a defense to murder.

On appeal, defendant has not challenged the correctness or validity of the duress instruction or any of the other instructions.

## C. **Closing arguments about duress**

In closing argument, the prosecutor argued that defendant's multiple stories about Chema and his alleged threats were not credible. The prosecutor further argued that even if Chema existed and threatened defendant, duress was not a defense to murder. The prosecutor clarified that duress could be a defense to attempted murder, but "[m]y view of the evidence is it just flat didn't occur." The prosecutor argued that the evidence showed that defendant was upset that Villagomez tried to kill him during the shooting in the alley. The prosecutor asserted defendant was one of the gunmen, and he killed Villagomez two days later.

21.

Defense counsel argued that defendant's testimony about Chema was credible, and that Chema was upset that Villagomez tried to kill defendant in the alley, which led him to withdraw as Chema's drug salesman. Defense counsel argued that Chema used defendant to kill Villagomez so that defendant would be blamed for the murder. Defense counsel did not argue that duress was a defense to murder.

Defense counsel argued defendant was not guilty of the offenses, and the homicide was justifiable, because there was a shoot-out between the two vehicles, and Villagomez was a dangerous person. Defendant reasonably feared that Villagomez was going to kill him based on the previous shooting in the alley, and Saldana's subsequent threats against defendant's wife.

In rebuttal, the prosecutor argued there was no evidence that defendant or anyone in his vehicle feared for their lives, since Villagomez and Arrellano were driving in front of them. There was no evidence that anyone in Arrellano's vehicle shot at defendant's vehicle until after the shots were fired from defendant's car. The prosecutor again said the defense of duress did not apply to murder, it applied to attempted murder, and that defendant's story about Chema was not credible.

### D. **The jury's first and second questions**

The jury began deliberations at 11:40 a.m. on January 20, 2011. At 2:46 p.m., the court received a note from the jury, which requested "clarification of aiding and abetting and first degree murder, second degree murder, and manslaughter."

At 3:45 p.m., the court received another note.

"[C]an a defense of duress apply to second degree murder or manslaughter?"

The court discussed these two notes with the prosecutor and defense counsel outside the jury's presence. The court conducted the discussion in chambers and off the record. The court allowed the jury to continue deliberating while it discussed the questions with the parties.

22.

At 3:52 p.m., the court recalled the jury into the courtroom and responded to the jury's notes.

"As to whether a defense of duress can apply to second degree murder or manslaughter, *the answer to that is that a defense of duress does not apply to second degree murder.* It can apply to manslaughter. Of course the appropriateness and application of the defense is always a matter for your determination based on the facts as you find them to be. But again, just to summarize it, duress is not a defense to the crime of second degree murder. It can be a defense to the crime of manslaughter." (Italics added.)

The court asked the foreperson whether this response resolved the jury's question in the second note. The foreperson said yes. The court then addressed the jury's first question:

"[T]hat asks for clarification of aiding and abetting in first degree murder, second degree murder, and manslaughter. And I hate to answer a question with a question …. I need to ask if you could, if you could clarify for me. Do you just need a clarification or review of the aiding and abetting instructions in general as to those crimes or is there – perhaps you can clarify for me more specifically what is the jury's request or what needs to be clarified according to your understanding with regards to the application of aiding and abetting to each of those three crimes. Is that something you can answer in court or would it be better for you to do a note?"

The foreperson asked to consult with the rest of the jury. The court directed the jury to return to the jury room and clarify its question about aiding and abetting.

The court did not receive another note from the jury that day. Neither party objected to the court's responses to the jury's notes. Defendant has not challenged these responses in this appeal.

E. **The jury's third and fourth questions**

At 10:25 a.m. on January 21, 2011, the court received the following question from the jury.

"1) When the law says duress does not apply to murder, does that mean that *if we feel duress occurred that a murder charge in either the 1st*

23.

*or 2nd degree is excluded.* Excluded meaning that [defendant] would not be guilty of murder in the 1st or 2nd degree?" (Italics added.)

At 10:45 a.m. on January 21, 2011, the court received another note from the jury.

> "1) Since duress does not apply to murder in the 1st or 2nd degree, if we feel that [defendant] was forced at gunpoint under duress to drive the van knowing that Chema, or others were going to murder ViaGomez [*sic*], does driving the van under duress constitute aiding and abetting by [defendant]."

## F. <u>The court's decision to reopen closing arguments</u>

At 12:03 p.m. on January 21, 2011, the court discussed the jury's third and fourth questions with the prosecutor and defense counsel. The court told the parties that it received both notes at the same time.

> "[THE COURT]: … After consulting with counsel in chambers, it's my understanding that both counsel are agreeable to the following procedure and please correct me if you are not.
>
> "It is difficult to answer either questions particularly the 10:45 a.m. question *without giving the jury such a detailed description of the law that it would almost seem to resolve the case for them and I am certainly not comfortable doing that.* There is legal authority that permits the court to reopen argument by counsel under – on limited issues under certain circumstances and what I am inclined to do is proceed as follows. Rather than the court answering their question and particularly given the circumstances giving them what I feel would be such a vague answer it might not be of assistance to them. *What I'm proposing to do is to bring the jury back … and permit counsel to reopen argument giving each party ten minutes to argue the issues contained and only the issues contained in … the two timed* [*questions*] … *that are addressed at 10:25 and 10:45.* After they have concluded the additional ten minutes of argument … I will read no additional instructions since I believe the instructions on the legal issues contained are all contained in the materials that they have and we will then send them back out to deliberate from there." (Italics added.)

The court asked the parties if they agreed. The prosecutor said yes. Defense counsel said:

> "Yes, Your Honor. *Although I did like the first suggestion of the court where Your Honor was going to instruct them that the answer to the question was it depends.* It has to do with what facts you have found to be

true and under those circumstances you have to make a determination as to whether or not what – something like that. You said that much better than I did and I thought that was a better suggestion." (Italics added.)

The court replied that defense counsel accurately recited the court's initial proposed response to the jury's 10:45 a.m. question. However, the court was concerned about giving a reply to the jury's 10:25 a.m. question, whether defendant was guilty of first or second degree murder if the jury found duress.

> "The answer to that question in essence from a legal perspective as I understand it is essentially no. Depends on what the jury finds to be the facts. They still need to find the requisite mental elements either on aiding and abetting or direct perpetrator as they relate to [defendant]. But from the court's perspective I have a concern that were the court to answer question one with what I feel is an accurate recitation of the law of duress, it would bring a risk of seeming to tell the jury to disregard that defense as it relates to the murder count and given the fact they were instructed on both murder and manslaughter and on a variety of different theories of liability, *I have a concern that that might seem to the jurors to be dispositive when in fact it really probably is not. Because there are a variety of different factual and legal determinations they have to make. So for that reason I think it is more appropriate to proceed by the second method.*" (Italics added.)

The court asked defense counsel whether he wanted to object to the decision to reopen argument: "I want to make sure you have an opportunity to fully protect your record." Defense counsel replied: "I think I have protected my record, Your Honor. I'll leave it at that." The court again stated there was legal authority to reopen argument during deliberations, asked the parties to research the matter, and called a recess.

After the recess, the court stated that it was going to respond to the jury's questions by permitting additional argument, based on *People v. Young* (2007) 156 Cal.App.4th 1165 (*Young*), and California Rules of Court, rule 2.1036.[13] The court asked defense counsel if he agreed. Defense counsel replied that *Young* and rule 2.1036 "allow

---

[13] All further references to rules are to the California Rules of Court.

the court great deal of flexibility in allowing counsel to reopen argument. *So I would agree that we can do that.*"**14** (Italics added.)

Defense counsel added that *Young* "says clearly there has to be some sort of impasse but subsequent rules and changes have taken that problem aside." Defense counsel agreed that the jury's questions raised "the interpretation of the jury instructions and how that is applied to the facts as found by the jury. And I think after further thought clearly one that can be resolved by further argument of counsel and not by simply bringing in more witnesses .…"

The court noted that the jury had not indicated it was deadlocked. However, the jury had submitted four questions about the same issue, and the most recent question raised factual issues.

> *"[I]t is very difficult for the court to answer the questions without seeming to either instruct the jury as to what they should find the facts to be or without essentially presuming those facts to be the facts that they have found them to be and I'm not at all certain that they are.* It very well may be that's what the jury has decided the facts are in this particular case. It may be that they are simply exploring their options in an attempt to reach agreement.…" (Italics added.)

The court decided it had the discretion to reopen argument based on *Young* and rule 2.1036 "in the context of a situation where the jury clearly is having difficulty resolving a particular issue and has repeatedly asked for assistance on it … but has not formally said we are deadlocked and cannot reach a verdict." While the jury had not indicated a deadlock, it had repeatedly reported that it was having difficulty with a particular issue. The jury had submitted four questions closely related to the same issue, and the questions showed it was difficult for the jury to resolve the interplay of these factual and legal concepts.

---

**14** As we will explain, *post*, a trial court has discretion under *Young* and rule 2.1036 to reopen closing argument in the midst of deliberations under certain circumstances. (*Young*, *supra*, 156 Cal.App.4th at pp. 1170-1172.)

26.

The court advised the attorneys that they would have 10 minutes to argue the issues raised in the jury's third and fourth notes. The court also decided to remind the jury to refer to the instructions that it had already received. The court asked the prosecutor and defense counsel if they agreed with the procedure. Both the prosecutor and defense counsel agreed, and they did not object.

## G. The court's response to the jury

At 1:30 p.m. on January 21, 2011, the jury returned to the courtroom. The court advised the jury:

> "Rather than the court directly answer your question[s] because you're asking us about a couple of legal concepts and I want to make sure that you have adequate input on that. Under certain circumstances the law does provide the court the discretion to permit closing argument by the attorneys to be reopened even when the jury has already been in deliberations for a period of time to deal just with certain limited issues. And in an effort to assist the jury and resolving the issues that they need to make a determination on to resolve the case and attempt to reach a verdict.
>
> "So what we're going to do in this particular case is the questions that you've asked us obviously deal with a couple of different legal issues and you've already received the instructions of law from that on the court. What I'm going to do – and we felt is the most appropriate procedure here is I'm going to give the attorneys an opportunity for ten minutes each to reopen their closing arguments to deal just with those contents that you have discussed or asked us about in the two notes that you've sent out."

The court reminded the jury that it already had the instructions on duress, aiding and abetting, and all of the other concepts in the case, and that it could refer to those instructions when it resumed deliberations.

## H. The parties' additional closing arguments

The prosecutor began his renewed argument by citing the jury's third question about duress, and argued that the duress defense did not apply to murder of any degree. "Which means that if you find that there was murder but that it was done under duress, it's murder, whichever degree it was."

27.

As for the jury's fourth question, about aiding and abetting under duress, the prosecutor stated that he did not know which facts the jury had decided, but offered different factual scenarios. The prosecutor argued that an aider and abettor was guilty of the same offense as the perpetrator of the crime if he had knowledge of what the perpetrator was going to do, and he did something to assist or encourage him. If he did not know what the perpetrator was going to do, then he was not an aider and abettor. The prosecutor argued that defendant was an aider and abettor if the jury decided that Chema and his associate existed, defendant knew they were going to kill Villagomez, and defendant drove them to Wasco knowing of their intent. "They shoot the guy from the van. That would be murder and would be first degree murder from the vehicle.… He had knowledge. He assisted. Duress is not a defense. Therefore, he would be guilty of whatever degree of murder you found it to be."

Defense counsel began his renewed argument by asserting that the jury had to focus on the required mental state. "What is in the mind of this man when he's in that van and he's driving to Wasco. What is he thinking?" Defense counsel asserted that defendant did not know what Chema intended to do to Villagomez. Defendant simply believed he was meeting with Chema to return the drugs and money, and get out of the drug business with him.

Defense counsel argued defendant did not share the same mental state, willfulness, and intent, as Chema and his associate had to kill Villagomez. Defendant had to have "the willful conduct of an individual, not someone with a gun to the back .…" Chema did not tell defendant what he was going to do in Wasco, so defendant did not share the same intent or mental state.

Defense counsel agreed that duress did not apply to murder. But counsel also argued that defendant was driving under duress and did not know Chema's mental state:

> "[Defendant] doesn't know he's going to go in and do the act with Chema and the other guy. He doesn't know that. They know but he doesn't. That

he's not required [*sic*] mental state. He's not a part of that transaction. He's not part of that behavior. He is not there. Physically he may be but the required mental state is not there .... [¶] Was he truly acting under his own will or was his will so overcome by the actions of others with their own purposes. Not shared by him. Not known to him. The required mental state. That's the key."

Defense counsel argued defendant likely believed Chema was going to kill him because he did not want to sell drugs for him anymore, and defendant feared for his life as he drove them to Wasco.

"How can someone be aiding and abetting if he has no power of his own actions? How can someone be aiding and abetting if he doesn't know the purpose of the actions he's been forced to take? The required mental state."

At 2:23 p.m., the jury resumed deliberations. After the jury left the courtroom, the court asked the attorneys if they wanted to place anything on the record. They both declined.

## I. **The verdicts**

At 10:13 a.m. on January 24, 2011, the jury returned with the verdicts, and found defendant guilty of count I, first degree murder of Villagomez, and not guilty of count II, attempted murder of Arrellano. The jury found the special allegation not true, that defendant did not personally and intentionally discharge a firearm.

## J. **Analysis**

Defendant contends the court violated his constitutional rights and committed reversible error because it "abdicated" its responsibility to respond to the jury's third and fourth questions, and instead directed the attorneys to give further argument on the issues of murder, aiding and abetting, and duress. Defendant argues that further argument cannot take the place of the court's mandatory duty to directly respond to jury questions.

Section 1138 provides that when the jurors "desire to be informed on any point of law arising in the case,... the information required must be given ...." This statute imposes a mandatory duty for the court to clarify any instructional confusion expressed

by the jury.  (*People v. Gonzalez* (1990) 51 Cal.3d 1179, 1212-1213, superceded by statute on another point as explained in *In re Steele* (2004) 32 Cal.4th 682, 690.)

> "The court has a primary duty to help the jury understand the legal principles it is asked to apply.  [Citation.]  This does not mean the court must always elaborate on the standard instructions.  Where the original instructions are themselves full and complete, the court has discretion under section 1138 to determine what additional explanations are sufficient to satisfy the jury's request for information.  [Citation.]  Indeed, comments diverging from the standard are often risky.  [Citation.]  The trial court was understandably reluctant to strike out on its own.  But a court must do more than figuratively throw up its hands and tell the jury it cannot help.  It must at least *consider* how it can best aid the jury.  It should decide as to each jury question whether further explanation is desirable, or whether it should merely reiterate the instructions already given.…"  (*People v. Beardslee* (1991) 53 Cal.3d 68, 97, italics in original.)

There are several problems with defendant's argument that the court "abdicated" its responsibility to respond to the jury's questions.  First, the record strongly suggests that defendant has forfeited appellate review of the court's decision.  Defendant asserts defense counsel preserved the issue and did nothing that could be construed as a forfeiture.  The record suggests otherwise.  When the court decided that additional instructions would not aid the jury, defense counsel initially disagreed and agreed with the court's initial reaction to respond to the jury's question about duress and aiding and abetting by saying, "it depends."  As the court continued to discuss the matter with the parties, defense counsel ultimately concurred with the court's decision to permit additional argument on the issues of aiding and abetting and duress.  Defendant's failure to object to having the case reopened forfeits this issue for appellate review.  (*Young*, *supra*, 156 Cal.App.4th at p. 1171.)

Defendant acknowledges that he did not propose specific language for the court to use in response to the jury's questions.  Defendant asserts he did not forfeit review of the issue by his failure to do so, because the court still had a mandatory duty to respond to the jury's questions.  As we will explain, however, the court did not ignore the jury's

30.

questions or decline to address them. Instead, the court exercised its discretion by having the attorneys reopen their closing arguments. (*Young*, *supra*, 156 Cal.App.4th at pp. 1170-1172.) Defendant suggests that it would have been simple for the court to craft an instruction in response to the jury's questions, and now offers a page of single-spaced language addressing the ultimate issue of whether defendant was guilty of the charged offenses. Defense counsel's failure to suggest additional instructions during trial forfeited any claim that the court failed to properly respond to the jury's question. (*People v. Abilez* (2007) 41 Cal.4th 472, 516, fn. 9 ["[t]o the extent defendant wished the court to modify an existing instruction itself correct in law, it was his burden to propose it. [Citation.]"].)

Second, as we have averred, it is settled that a trial court has discretion, in the midst of the jury's deliberations, to direct the attorneys to reopen their closing arguments under certain circumstances. (*Young*, *supra*, 156 Cal.App.4th at pp. 1170-1172.)

> "There is authority guiding the trial court's actions with respect to the order of a jury trial and its obligations upon being faced with a deadlocked jury. Section 1093 delineates the order that trial procedures shall follow, including the direction that the prosecutor and defense counsel may argue the case to the court and jury upon the close of evidence. [Citation.] Section 1094 grants the trial court broad discretion to depart from the order specified in section 1093. Section 1140 entitles the trial court to ascertain whether there is a reasonable probability a jury deadlock might be broken. [Citations.] When the court is faced with a deadlocked jury, it must proceed carefully, lest its actions be viewed as coercive. [Citation.] At the same time, when faced with questions from the jury, including that they have reached an impasse, 'a court must do more than figuratively throw up its hands and tell the jury it cannot help. It must at least *consider* how it can best aid the jury.' [Citation.]" (*Young*, *supra*, 156 Cal.App.4th at pp. 1171-1172, fn. omitted, original italics.)

A trial court thus has the inherent authority and discretion to reopen closing argument when appropriate. (*Young*, *supra*, 156 Cal.App.4th at p. 1172.) Indeed, rule 2.1036 expressly provides that when a jury reports it has reached an impasse in deliberations, if the trial judge determines further action may assist the jury in reaching a

verdict, the trial judge may "[p]ermit attorneys to make additional closing arguments." (Rule 2.1036(b)(3); see *Young*, *supra*, 156 Cal.App.4th at p. 1171, fn. 7.)

In addition, the same rule applies "when a jury expresses confusion and an impasse in its deliberations *related to the governing law and instructions*, particularly in light of the trial court's broad discretion to alter the sequence of trial proceedings. [Citation.]" (*People v. Ardoin* (2011) 196 Cal.App.4th 102, 129, fn. 10, italics added.)

When the court in this case considered the appropriate response to the jury's third and fourth questions, both the prosecutor and defense counsel acknowledged that the court had discretion to reopen argument pursuant to both *Young* and rule 2.1036. On appeal, however, neither defendant nor the People have cited to either *Young* or rule 2.1036.

In any event, the trial court acted well within its discretion and inherent authority when it decided to have the parties reopen their closing arguments and address the interwoven factual and legal issues raised by the jury's third and fourth questions. The court carefully considered the entirety of the jury's four inquiries before deciding that it should reopen closing arguments. The court expressed the legitimate and reasonable concern that the jury had asked four questions about the same topics. The court had already offered one response, but the jury still had questions on the same topics. The court correctly observed that any possible response to the jury's third and fourth questions would improperly invade the jury's fact-finding province. Indeed, even defense counsel acknowledged that a response to the jury's questions depended on its resolution of the disputed facts in the case, particularly whether Chema existed and if defendant knew about Chema's alleged intent to kill Villagomez. Moreover, the jury's third and fourth questions did not indicate that it needed additional guidance on the law.

We note that in contrast to *Young*, the jury in this case did not indicate that it had reached an impasse or it was deadlocked. It was reasonable for the court to find that the jury's repeated inquires about the same topics indicated that it was having difficulty with

the factual and legal issues implicated by murder, duress, and aiding and abetting, given the two vastly different factual scenarios offered by the People and the defense: whether defendant willfully drove the green van, fired one of the weapons at Arrellano's vehicle, and intended to kill Villagomez and/or Arrellano; or Chema forced defendant to drive to Wasco and find Villagomez, defendant did not know that Chema intended to kill Villagomez, defendant did not fire any weapon, and defendant did not intend to kill Arrellano or Villagomez.

Based on this stark difference between the prosecution and defense evidence, the answers to the jury's questions were dependent on which facts it had found. The court did not "abdicate" its duty to respond to the jury's questions, but instead assisted the jury in a neutral manner by giving each party a brief opportunity to argue the application of the law to the direct and circumstantial evidence presented by the prosecution and defense evidence. The court did not make any coercive remarks, give coercive instructions, or urge the jurors to reach agreement. (See, e.g., *Young*, *supra*, 156 Cal.App.4th at p. 1172.)

Defendant argues that the court abdicated its responsibility to respond to the jury's questions because argument by counsel can never take the place of the court's instructional duties. Defendant's argument is based on *Taylor v. Kentucky* (1978) 436 U.S. 478. *Taylor* is inapposite to the instant case, and addressed a situation where the trial court failed to instruct the jury about the presumption of innocence, and gave a "confusing" and "truncated" instruction about reasonable doubt. (*Id*. at pp. 479, 488.) *Taylor* rejected the state's claim that the prosecutor's discussion of reasonable doubt rendered the error harmless, and held the court's failure to instruct on these crucial principles was prejudicial and reversible error. (*Id*. at pp. 488-489.) "[Defendant's] right to have the jury deliberate solely on the basis of the evidence cannot be permitted to hinge upon a hope that defense counsel will be a more effective advocate for that proposition than the prosecutor will be in implying that extraneous circumstances may be

33.

considered. It was the duty of the court to safeguard petitioner's rights, a duty only it could have performed reliably. [Citation.]" (*Id*. at p. 489, fn. omitted.)

In contrast to *Taylor*, the court in this case fully and correctly instructed the jury on all applicable legal principles, and defendant has not claimed that the court's instructions were erroneous. The question on appeal is whether the trial court properly responded to the jury's questions by directing the parties to offer additional arguments on the relevant issues. As we have already explained, the court acted well within its discretion by making such a decision.

Finally, we also reject defendant's claim that the renewed arguments by the prosecutor and defense counsel were incorrect as a matter of law. Both attorneys carefully addressed the legal issues based on whether the jury had reached certain factual findings. The prosecutor argued duress was not a defense to murder, defendant's story about Chema was not credible, and that defendant intended to kill Villagomez because of the prior drug dispute. Defense counsel argued that defendant lacked the intent to be an aider and abettor because he did not know what Chema was going to do when they found Villagomez.

Defense counsel repeatedly urged the jury to focus on the requisite mental state for aiding and abetting, and argued that defendant did not know what Chema intended to do when they found Villagomez. Counsel agreed that duress did not apply to murder, but asserted that defendant did not share Chema's mental state, willfulness, and intent to kill Villagomez. Defendant had to have "the willful conduct of an individual, not someone with a gun to the back …."

Defendant argues the attorneys' arguments were legally erroneous because they did not fully cite the instructional definitions of aiding and abetting, particularly whether defendant had the specific intent to aid, facility, promote, encourage, or instigate the perpetrator's commission of the crime. During the instructional phase, however, the court fully instructed the jury on aiding and abetting, and that someone is an aider and

34.

abettor only if he *"knows of the perpetrator's unlawful purpose and he … specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of that crime,…"* (CALCRIM No. 401, italics added.) While the court did not reread this instruction, it reminded the jury to again review the instructions which it had already received after it had heard the attorneys' renewed arguments. We presume the jurors comprehended and accepted the court's directions. (*People v. Lewis* (2001) 26 Cal.4th 334, 390; *People v. Welch* (1999) 20 Cal.4th 701, 771.)

We thus conclude that the court did not "abdicate" its responsibility to respond to the jury's questions, and it had the discretion to have the parties reopen their closing arguments. We further find that the nature of the jury's questions indicated that it was at an impasse regarding the issues of duress and aiding and abetting, the questions involved the application of the law to the conflicting evidence presented by the prosecution and defense, the court did not abuse its discretion by ordering further argument, and the attorneys did not misstate the applicable legal principles.

## II.      Defendant's indeterminate term is not unconstitutional

Defendant contends that the sentence of 25 years to life for count I, first degree murder, constitutes cruel and/or unusual punishment in violation of the federal and state constitutions. Defendant argues the indeterminate term is unconstitutional because he was convicted as an aider and abettor, and the verdicts indicate the jury believed he acted under duress.

We begin with the nature of the verdicts. As explained in issue I, *post*, the jury was correctly instructed that duress was not a defense to murder, but it was a defense to attempted murder. Defendant was convicted of first degree murder of Villagomez, but he was found not guilty of the attempted murder of Arrellano. In addition, the jury found the special allegation that defendant personally and intentionally discharged a firearm not

to be true, indicating that it believed he was the driver and not one of the gunmen during the fatal shooting.

Defendant posits that the jury found him not guilty of attempted murder, and found the personal discharge allegation not true, because it concluded that he did not fire one of the weapons and that he drove his vehicle under duress. While such a conclusion is certainly possible, the entirety of the trial evidence also suggests that the jury could have found that defendant was the driver and did not intend to kill Arrellano. Indeed, there was no evidence that Arrellano was involved in the dispute between defendant, Villagomez, and Saldana. Hinojosa, who heard the shooting in the alley, reported that he spoke with defendant after the homicide, and defendant said that he had shot off someone's head and that Arrellano was not the target. Thus, the jury may have decided that defendant, as an aider and abettor, shared the gunman's intent to kill Villagomez because of their prior dispute and the alley shooting, but that he did not intend to kill Arrellano.

In any event, defendant argues that his sentence is unconstitutional since the jury found he was an aider and abettor, and that he acted under duress. Defendant seems to argue that the actual gunman – Chema, his associate, or some third party not otherwise identified – would have deserved the indeterminate term. The California Supreme Court has consistently declined to undertake the type of "intercase proportionality review" that defendant's argument suggests. (*People v. Riel* (2000) 22 Cal.4th 1153, 1223.)

"To determine whether a sentence is cruel or unusual as applied to a particular defendant, a reviewing court must examine the circumstances of the offense, including its motive, the extent of the defendant's involvement in the crime, the manner in which the crime was committed, and the consequences of the defendant's acts. The court must also consider the personal characteristics of the defendant, including age, prior criminality, and mental capabilities. [Citation.] If the court concludes that the penalty imposed is 'grossly disproportionate to the defendant's individual culpability' [citation], or, stated

36.

another way, that the punishment ' " 'shocks the conscience and offends fundamental notions of human dignity' " ' [citation], the court must invalidate the sentence as unconstitutional." (*People v. Hines* (1997) 15 Cal.4th 997, 1078.)

Defendant's sentence is not unconstitutional. Defendant admitted that he has a long criminal record which began in 1984 and continued to 2007. His prior offenses were primarily vehicle and drug crimes, he was placed on probation for the early crimes, he committed additional offenses and violated probation, and he was sentenced to prison in 1997 for possession for sale (Health & Saf. Code, § 11378) and maintaining a place for distributing controlled substances (Health & Saf. Code, § 11366).

Defendant was 46 years old at the time of sentencing. He said he was using large amount of methamphetamine on a daily basis at the time of his arrest. Defendant admittedly acted as an armed narcotics dealer in Wasco and refused to pay "taxes" to gang members who operated in the area. He also admitted that he engaged in a disputed methamphetamine sale with Villagomez and gave him less drugs than he had paid for. The dispute resulted in an argument and a subsequent shoot-out between the two men. Defendant used a nine-millimeter handgun during the shooting in the alley, and he was accompanied by a man with a shotgun. Defendant then acted as the driver of a vehicle from which multiple shots were fired, from a nine-millimeter handgun and shotgun, into the vehicle occupied by Villagomez and Arrellano. The shooting occurred in a residential neighborhood where children and adults were standing on the street, and they saw the car chase and heard the gunshots. Defendant, as a drug dealer, did not hesitate to use deadly force when challenged by an unhappy purchaser.

**III.    The court did not abuse its discretion when it declined to strike probation report's factual summary**

Defendant contends the court should have granted his motion to strike the factual summary contained in the probation report. Defendant argues the probation report's

factual summary is incorrect and contrary to the evidence which was introduced at his trial.

## A.     The probation report

The probation report's factual summary, as compiled by the probation officer, begins with the statement that it is based on the report compiled by the Kern County Sheriff's Department.

> "It should be noted that the undersigned did not have access to the jury trial transcripts at the time of the dictation of this report. Consequently, it is possible that additional and/or conflicting information was developed during the course of the trial that would contradict the summary offered.  It is with these thoughts in mind the following summary is offered."

The factual summary stated that witnesses said the fatal gunshots were fired from a van which contained two or three Hispanic males; that Arrellano told detectives the van was next to his vehicle, he saw gun barrels pointed at them, and Villagomez shouted, " 'It's over, let's quash this.' "  It further stated that Saldana arrived at the homicide scene and told the detectives about the drug dispute with defendant, and defendant said he had decided to rip them off for the money before the transaction occurred.  Saldana also said that defendant and Villagomez met in the alley to settle the dispute, but defendant started shooting at him.

The factual summary further stated that when defendant was arrested, he said that Villagomez tried to kill him in the alley, Villagomez later appeared at his house and yelled at him to come out, and that two unknown subjects forced him to drive his van to Wasco on the day of the homicide.

## B.     The sentencing hearing

At the sentencing hearing, defense counsel asked the court to order the probation report's factual summary to be stricken because it contained statements which were inconsistent with the trial evidence.  Defense counsel acknowledged that the probation

officer stated that the factual summary was prepared without reference to the trial record, but complained that the summary failed to address the trial evidence about duress.

The prosecutor agreed that there was "some considerable distance" between the factual summary and the trial evidence, particularly about the eyewitness observations of the fatal shooting.

The court denied defense counsel's request to strike the factual summary, because the probation officer acknowledged that the factual summary was based on the sheriff's reports and not from the trial evidence, and the summary was "at least reasonably accurate." The court noted that defendant's duress defense was suggested in the factual summary, but it was "more fully developed" at trial.

> "So bearing in mind that any future court looking at this matter, should that be the case – or a future parole board looking at this matter, should that ultimately be the case, they will be seeing the sentencing transcript as well as the probation report itself. [¶] The Court will note that they should bear in mind there was a significant additional amount of material developed at trial."

## C.   Analysis

"The purpose of a probation report is to assist the sentencing court in determining an appropriate disposition. [Citation.] The court has the unquestioned discretion to reject it in part or in toto.…" (*People v. Municipal Court* (*Lopez*) (1981) 116 Cal.App.3d 456, 459.)

The court did not abuse its discretion when it denied defendant's motion to strike the factual summary. The factual summary was reasonably accurate but omitted defendant's trial testimony about Chema's alleged threats. As noted during trial, however, defendant failed to tell law enforcement officers about Chema when he was arrested. The court acknowledged that there were some discrepancies between the summary and the trial evidence, but noted that the summary itself acknowledged the same thing. Any future impact from the discrepancies in the probation report's factual

39.

summary will be offset by the sentencing transcript, the trial court's acknowledgement of the discrepancies, and this opinion's extensive discussion of the trial evidence.

## **DISPOSITION**

The judgment is affirmed.

_____
Poochigian, J.

WE CONCUR:

_____
Cornell, Acting P.J.

_____
Gomes, J.